## ST. PAUL AND PACIFIC RAILROAD COMPANY v. NORTHERN PACIFIC RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 54. Argued November 5, 6, 1890. — Decided March 2, 1891.

The grant of public land to the Northern Pacific Railroad Company in the act of July 2, 1864, 13 Stat. c. 217, p. 365, was a grant *in præsenti*, in the nature of a float until the route should be determined, and, after that, attaching to specific sections, capable of identification, except as to sections which were specifically reserved.

The force of such grant was in no respect impaired, or its construction affected, by the provision in section four of that act that patents for the land should be issued as sections of twenty-five miles of the road should be completed; but the company was not at liberty to dispose of its land not patented, without the consent of Congress.

When the termini of a railroad for whose construction a land grant is made are mentioned, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line.

The line of the Northern Pacific Railroad through the State of Minnesota having been definitely determined in accordance with law, and the road having been constructed, the company's right to the lands in place along the line of its route as so located, and to other lands to make up deficiencies, cannot be doubted, unless a prior right attached to those lands under an earlier grant from Congress.

1

Opinion of the Court.

The several acts granting public lands in aid of the construction of the St. Paul and Pacific Railroad being examined and analyzed, it appears that the grants to that company, so far as they form the subject of controversy, were subsequent in date to the act under which the Northern Pacific Railroad Company claims, and come under the well settled rule that, where different grants cover the same premises, the elder takes the title.

The operation of the act of March 3, 1857, 11 Stat. c. 99, p. 195, upon lands previously reserved, was restrained by the act of March 3, 1865, 13 Stat. c. 105, p. 526.

The act of March 3, 1871, 16 Stat. c. 144, p. 588, does not purport to be an amendment of the act of March 3, 1857, but only authorizes a change in the lines of the company, in consideration of the relinquishment of certain lands.

The exception, in the grant to the Northern Pacific Railroad Company, of all subsequent grants prior to the definite location of its road, was not intended to cover other grants for the construction of roads of a similar character.

After the withdrawal from sale or preëmption of the granted odd sections, no interest in the granted lands, adverse to the rights of the company, could be acquired except by special legislative declaration, nor, indeed, in the absence of its announcement, after the general route was fixed.

In order to secure the grant in the finished sections it was not necessary that the road, throughout its whole length, should be fixed; but the general purpose of the act was accomplished if such reasonable portions of the general route were located as would intelligently guide the officers of the Land Department with reference to the patents to be issued for lands intended for the company.

There was in this case no occasion for the exercise of the judgment of the Secretary of the Interior in selecting indemnity lands, as all the lands within the indemnity limits only made up in part for the deficiency.

THE case is stated in the opinion.

*Mr. S. U. Pinney* and *Mr. George B. Young*, for appellants.

*Mr. James McNaught* and *Mr. A. H. Garland*, for appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

The bill in this case was filed by the Northern Pacific Railroad Company to establish its right to land in odd-numbered sections, amounting to many thousand acres, situated in the neighborhood of Glyndon, in Minnesota, which it claims under a grant of the United States, made by the act of Congress of

July 2, 1864, to "aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific coast, by the northern route." 13 Stat. c. 217, p. 365.

By the first section of that act, the Northern Pacific Railroad Company was incorporated, and authorized to lay out, construct and maintain a continuous railroad and telegraph line, with the appurtenances, from a point on Lake Superior, in the State of Minnesota or Wisconsin, and thence westerly by the most eligible route, as should be determined by the company, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget Sound, with a branch by the valley of the Columbia River, to a point at or near Portland, in the State of Oregon.

By its third section, a grant of land was made to the company. Its language is: "That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections: *Pro-*

*vided*, That if said route shall be found upon the line of any other railroad route to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act."

By the fourth section it was enacted: "That whenever said 'Northern Pacific Railroad Company' shall have twenty-five consecutive miles of any portion of said railroad and telegraph line ready for the service contemplated, the President of the United States shall appoint three commissioners to examine the same, and if it shall appear that twenty-five consecutive miles of said road and telegraph line have been completed in a good, substantial and workmanlike manner, as in all other respects required by this act, the commissioners shall so report to the President of the United States, and patents of lands, as aforesaid, shall be issued to said company, confirming to said company the right and title to said lands, situated opposite to, and coterminous with, said completed section of said road ; and, from time to time, whenever twenty-five additional consecutive miles shall have been constructed, completed and in readiness as aforesaid, and verified by said commissioners to the President of the United States, then patents shall be issued to said company conveying the additional sections of land as aforesaid."

By the sixth section it was enacted: "That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry or preëmption before or after they are surveyed, except by said company, as provided in this act ; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, 1862, shall be, and the same are hereby, extended to all other lands on

the line of said road, when surveyed, excepting those hereby granted to said company."

By the express declaration of the act the grants were made and the rights and privileges were conferred upon and accepted by the company, on the condition that it should commence work on the road within two years from the approval of the act by the President, and complete and equip the whole road by the 4th of July, 1876; and the further condition that, if the company should make any breach of the conditions of the grants, and allow the same to continue for upwards of one year, then at any time thereafter the United States might "do any and all acts and things" needful and necessary to insure a speedy completion of the road. (Secs. 8 and 9.) Subsequently a joint resolution was passed by Congress extending the time for the commencement of the road to July 2, 1868, and for its completion to July 4, 1878. 14 Stat. 355, Sec. 2.

As seen by the terms of the third section of the act, the grant is one *in præsenti ;* that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, preëmption or other disposition previous to the time the definite route of the road is fixed. The language of the statute is "that there be, and hereby is, granted" to the company every alternate section of the lands designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future.

The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but when once identified the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one *in præsenti ;* that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route.

This is the construction given to similar grants by this court, where the question has been often considered; indeed,

it is so well settled as to be no longer open to discussion. *Schulenberg* v. *Harriman*, 21 Wall. 44, 60; *Leavenworth, Lawrence &c. Railroad Co.* v. *United States*, 92 U. S. 733; *Missouri, Kansas &c. Railway Co.* v. *Kansas Pacific Railway Co.*, 97 U. S. 491; *Railroad Co.* v. *Baldwin*, 103 U. S. 426. The terms of present grant are in some cases qualified by other portions of the granting act, as in the case of *Rice* v. *Railroad Co.*, 1 Black, 358; but unless qualified they are to receive the interpretation mentioned.

It is contended that they are qualified, and restricted by the provision of the fourth section, that whenever twenty-five miles of the road are completed in a good, substantial and workmanlike manner, and the commissioners appointed to examine the same have made a report to that effect to the President, patents shall be issued "confirming to said company the right and title to said lands, situated opposite to, and coterminous with, said completed section of said road." This provision, it is urged, is inconsistent with the theory that a title to the lands had previously vested in the company. We do not think so. There are many reasons why patents should be issued upon the completion of each section of the road. They would not only identify the lands as coterminous with the completed section, but they would be evidence that, as to that portion of the road, the conditions of the grant had been complied with, and that it was thus freed from any liability to forfeiture for a disregard of them. They would also obviate the necessity of any further evidence of the grantee's title. As deeds of further assurance they would thus be of great value, in giving quiet and peace to the grantee's possession. There are many instances in the legislation of Congress where patents are authorized to be issued to parties in further assurance of their title, notwithstanding a previous legislative grant to them or a legislative confirmation of a previously existing claim. The previous grant or confirmation is in no respect impaired thereby, or its construction affected. See on this point *Langdeau* v. *Hanes*, 21 Wall. 521; *Wright* v. *Roseberry*, 121 U. S. 488, 497.

Although the restraints in the act against the sale or aliena-

tion of the lands when once identified are not the subject of consideration in the present case, it may be well, to obviate misapprehension, to observe that the company, notwithstanding its possession of the title, was not at liberty to dispose of the lands without the consent of Congress, except as each twenty-five mile section was completed and accepted by the President, so as to deprive the United States of the right to compel their application to the purposes of the grant, or so as to prevent their forfeiture in case of the company's failure to comply with its conditions. Congress in allowing a mortgage upon the land, and in other ways, may have granted permission to the company to use and dispose of the lands or a portion thereof, but with this we are not now concerned. The construction we give to the granting terms of the act, as qualified by subsequent provisions, not only secures the application of the property to the construction of the road and telegraph line, and thus carries out the purposes of the government, but also secures the company against any attempted alienation of the land to other parties.

Having expressed our opinion as to the character of the title which Congress conveyed to the Northern Pacific Railroad Company by the act of July 2, 1864, we proceed to consider whether it was, by a subsequent location of the contemplated road, made to cover the lands for which the present suit is brought.

The general location of the route of the Northern Pacific Railroad was designated in 1869, and a map of it, approved by the Secretary of the Interior, was filed in the office of the commissioner of the general land office in August, 1870; and thereupon the Secretary ordered the withdrawal by the local land officers in Wisconsin and Minnesota, from sale, preemption, homestead and other disposal, of the odd-numbered sections not sold or reserved, and to which prior rights had not attached, within twenty miles on each side of the said line, for the benefit of the company. Subsequently this general route in Minnesota was changed, and a map corrected in accordance with the change, approved by the Secretary of the Interior, was filed in the general land office, on the 8th of October,

1870, and on the 12th of that month the Secretary ordered the withdrawal of the lands in conformity with the new general route adopted. The company then proceeded with the work of definitely locating the line of the road through that State, and on the 21st of November, 1871, filed in the office of the commissioner of the general land office a map or plat of the line thus definitely fixed, approved by the Secretary of the Interior. The company subsequently constructed and equipped the road through that State in all respects as a first-class railroad, and has since operated and maintained it. The road was accepted and approved by the President in accordance with the provisions of the fourth section of the act of July 2, 1864.

By the joint resolution of Congress of May 31, 1870, it was provided that in the event that there was not in any State or Territory, in which the main line or a branch of the road of the company might be located, the amount of lands per mile granted by Congress, within the limits prescribed by its charter, then the company should be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such State or Territory within ten miles on each side of the road, beyond the limits prescribed in the charter, as would make up the deficiency, on the said main line or branch, in the amount of lands that had been granted, sold, reserved, occupied by homestead settlers, preëmpted or otherwise disposed of, subsequent to the passage of the act of July 2, 1864. 16 Stat. 378.

After a map of the general route of the road of the plaintiff was filed, as above stated, and the line of the road in Minnesota was definitely fixed, the commissioner of the general land office designated, upon maps and records in his office, the limits of the lands granted by Congress to the plaintiff, according to the provisions of the act of 1864, and the above joint resolution, namely, the twenty, thirty and forty-mile limits on each side of the line of definite location, the first named being the limits of the lands in place; the second, the limits of the indemnity lands; and the third, or forty-mile limit, the limits of

the further indemnity granted by the joint resolution of May 31, 1870. And upon such designation it was found that there was not in the State, within those limits, at the time of the final location of the road, the amount of lands intended by the grant of Congress for the plaintiff, not previously granted, sold, occupied by homestead settlers, preëmpted or otherwise disposed of.

The right of the plaintiff, the Northern Pacific Railroad Company, to the lands in place along the line of its route as definitely located in the State of Minnesota, and to other lands, to make up deficiencies within those limits, caused by previous grants, sales, reservations, settlements or preëmptions, to be taken from the indemnity limits, or within the forty-mile withdrawal, will not admit of serious doubt, unless a prior right attached to those lands by an earlier grant of the United States. Such earlier grant is asserted by the defendants under the act of Congress of March 3, 1857, and subsequent legislation changing its operation. 11 Stat. c. 99, p. 195. By that act there was granted to the Territory of Minnesota, for the purpose of aiding in the construction of certain railroads therein mentioned, one of which was a railroad from Stillwater by way of St. Paul and St. Anthony to a point between the foot of Big Stone Lake and the mouth of Sioux Wood River, with a branch via St. Cloud and Crow Wing to the navigable waters of the Red River of the North, at such point as the legislature of the Territory might determine, every alternate section of land, designated by odd numbers, for six sections in width, on each side of said road and branches. It was also provided that the Territory or future State might select, subject to the approval of the Secretary of the Interior, from any lands of the United States nearest to the tiers of sections specified, so much land, in alternate sections or parts of sections, as should be equal to such of the granted lands as the United States might have sold or appropriated, or to which rights of preëmption might have attached when the lines or routes of the road and branches were definitely fixed. It was further provided that the lands so located should in no case be further than fifteen miles from the lines of the road and branches.

On the 22d of May, 1857, the legislature of Minnesota passed an act to execute the trust imposed by the act of Congress, and created a corporation, called the Minnesota and Pacific Railroad Company, with power to locate, build and operate a railroad, in conformity with that act, from Stillwater, by way of St. Paul and St. Anthony, via Minneapolis, to the town of Breckinridge on the Sioux Wood River, with a branch from St. Anthony, via St. Cloud and Crow Wing, to St. Vincent on the Red River of the North, and to aid in the construction of that road and branches conveyed all of its interest in the lands granted by the United States for that purpose.

In November, 1857, this railroad company thus created located the entire main line of its road and that portion of the branch line from St. Anthony via Anoka and St. Cloud to Crow Wing, and the maps of definite location thereof were approved by the Secretary of the Interior and filed in the general land office in December of that year.

In July, 1858, that railroad company executed a mortgage to trustees upon its railroad, and all its alienable franchises, and the rights and interest which it had acquired or might acquire in the lands granted by the Territory, to secure the payment of certain bonds which the Territory had authorized it to issue. The company having defaulted in the payment of those bonds, the mortgage was foreclosed, the property was sold, and the State of Minnesota, which had superseded the Territory, became the purchaser.

Subsequently in March, 1862, its legislature passed an act by which all the rights, franchises, property and interests of the Minnesota and Pacific Railroad Company thus acquired by the State were granted to certain persons named, their associates and successors, who were incorporated by the name of the St. Paul and Pacific Railroad Company. The grant of the State was accepted by that company, with all its conditions.

In July 1862, it became evident that it would be more advantageous for the St. Paul and Pacific Railroad Company, and for the State of Minnesota, that the line of branch railroad which was authorized to be constructed should be changed,

and to accomplish this Congress, on the 12th of that month,. passed the following joint resolution :

" *Whereas* by. an act of. Congress approved March third, eighteen hundred and fifty-seven, there was granted to the Territory of Minnesota · lands to aid in the construction of a railroad from Stillwater, via St. Paul and St. Anthony, to· a· point between the foot of Big Stone. Lake and the mouth of Sioux Wood River, with a branch, via St. Cloud and Crow Wing, to the navigable waters of the Red River of the North, the northern terminus of which was fixed by the legislature of said Territory at St. Vincent; and whereas it is now believed that the public interests require a change of · location of a part of said branch road; *Therefore,* —

" *Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That. in lieu of that part of the railroad grant to Minnesota Territory by act of Congress approved third March, eighteen hundred and fifty-seven, which extends northwesterly from the inter-section of the tenth standard parallel with the fourth guide meridian, there shall be granted to the State of Minnesota the alternate sections within six-mile limits of such new branch line of route as the authorities of the State may designate, having its southwestern terminus at any point on the existing. line, between the Falls of St. Anthony and Crow Wing, and extending in a northeasterly direction to the waters of Lake Superior, with a right of indemnity between the fifteen-mile limits thereof, provided this resolution shall take effect from the filing in the general land office of the acceptance by the authorities aforesaid of such substitution ; whereupon the land north of the intersection aforesaid · in the grant as authorized by the said act of third March, eighteen hundred and fifty-seven, being by said acceptance disencumbered of the railroad grant, shall be dealt with as other · public lands of the United States." 12 Stat. pp. 624, 625.

On the 6th of March, 1863, the legislature of Minnesota accepted the terms and. provisions of this joint resolution by an act approved on that day, an authenticated copy of which was subsequently, on February 26, 1864, filed in the general land.. office.

On the 28th of May, 1864, the board of directors of the St. Paul and Pacific Railroad Company adopted the following resolution :

"*Resolved by the Board of Directors of the St. Paul and Pacific Railroad Company,* That the terms, conditions and provisions of the joint resolution of the Congress of the United States, approved July 12, 1862, entitled ' A joint resolution authorizing the State of Minnesota to change the line of certain branch railroads in said State, and for other purposes,' and also the terms, conditions and provisions of the act of the legislature of the State of Minnesota, approved March 6, 1863, entitled ' An act to authorize the St. Paul and Pacific Railroad Company to construct a branch road to Lake Superior,' and also the terms, conditions and provisions of the act of the legislature of the State of Minnesota, approved March 4, 1864, entitled ' An act to extend the time for the construction of the branch road of the St. Paul and Pacific Railroad Company,' be, and the same and each and every of them are, hereby approved, accepted and assented to by the St. Paul and Pacific Railroad Company, and the president and secretary of this company are hereby directed to transmit a duly certified copy of this resolution to the governor of the State."

The resolution was accordingly transmitted to the governor.

The joint resolution of Congress of July 12, 1862, and its acceptance by the State of Minnesota and the St. Paul and Pacific Railroad Company, established the intersection of the tenth standard parallel with the fourth guide meridian as the northern terminus of the branch line. That portion of the country in Minnesota which was northwesterly of the intersection was thus disencumbered of the railroad grant under the act of March 3, 1857. And that portion south of the intersection and west of the route of the branch road definitely located, composing the alternate sections granted, was distant many miles east of the lands in controversy in this suit. The act of 1857 provided for the construction of a railroad from Stillwater, by way of St. Paul and St. Anthony, to a point between the foot of Big Stone Lake and the mouth of Sioux Wood River, with a branch via St. Cloud and Crow Wing

to the navigable waters of the Red River of the North, at such point as the legislature of the Territory might determine. By the change effected this branch was to be constructed north only to the intersection designated, and a direct line via St. Cloud and Crow Wing to that point would also be a long way from the lands in controversy. When the termini of a railroad are mentioned, for whose construction a grant is made, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line. No unnecessary deviation from such line would be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant. The route via St. Cloud and Crow Wing to the intersection mentioned would be almost in a direct northerly line; a route via those places to Glyndon would involve a westerly deviation of nearly a hundred miles. Of course such a detour from a direct line would be inadmissible. And as to the new branch authorized to Lake Superior, that would be only in an opposite direction.

It is, however, earnestly contended by the appellants that they are entitled to the lands in question by the subsequent acts of Congress of March 3, 1865, and March 3, 1871; and to these acts we now turn our attention.

The act of March 3, 1865, " extending the time for the completion of certain land-grant railroads in the States of Minnesota and Iowa, and for other purposes," 13 Stat. c. 105, p. 526, in its first section increases the grant made to Minnesota by the act of March 3, 1857, to aid the construction of certain railroads, from six alternate sections per mile on each side of such roads and branches to ten sections per mile. Its second section enlarges the indemnity limits from fifteen to twenty miles from the lines of the roads and branches. Its third section excepts from the operation of the act any lands previously reserved by act of Congress or in any other manner by competent authority, to aid in any object of internal improvement or other purpose. The ninth section declares that the provisions of the act shall " be construed so as to apply and extend to that portion of the line authorized to be vacated.

by the joint resolution approved July 12, 1862, entitled ' A joint resolution authorizing the State of Minnesota to change the line of certain branch railroads in said State, and for other purposes,' notwithstanding the vacation. thereof by said State, as though said joint resolution had not passed, and also to the line adopted by said State in lieu of the portion of the line so vacated."

This act makes an additional and new grant to Minnesota of four sections of land per mile to aid in the construction of its railroads, and enlarges the indemnity limits from fifteen to twenty miles ; and the provisions of its ninth section being applied and extended to that portion of the line between the intersection of the tenth standard parallel with the fourth guide meridian and St. Vincent, vacated by the joint resolution of July, 1862, and also to the line running eastwardly to Lake Superior, authorized in lieu of the vacated line, in effect made a new grant between St. Vincent and the intersection mentioned, and enlarged the grant for the line to Lake Superior.

On the 3d of March, 1871, Congress passed an act authorizing another change to be made by the St. Paul and Pacific Railroad Company in its lines, "in consideration of a relinquishment of lands." That act is as follows:

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the St. Paul and Pacific Railroad Company may so alter its branch lines that, instead of constructing a road from Crow Wing to St. Vincent, and from St. Cloud to the waters of Lake Superior, it may locate and construct, in lieu thereof, a line from Crow Wing to Brainerd, to intersect with the Northern Pacific Railroad, and from St. Cloud to a point of intersection with the line of the original grant at or near Otter Tail or Rush Lake, so as to form a more direct route to St. Vincent, with the same proportional grant of lands to be taken in the same manner along said altered lines, as is provided for the present lines by existing laws: *Provided, however,* That this change shall in no manner enlarge said grant, and that this act shall only take effect upon condition of being

in accord with the legislation of the State of Minnesota, and upon the further condition that proper releases shall be made to the United States by said company, of all lands along said abandoned lines from Crow Wing to St. Vincent and from St. Cloud to Lake Superior, and that upon the execution of said releases such lands so released shall be considered as immediately restored to market, without further legislation." 16 Stat. c. 144, p. 588.

The act of March 3, 1865, as said above, is a new grant, referring to, but distinguishable and distinct from, that made by the act of March 3, 1857. The act of March 3, 1871, only authorizes the construction of different lines from those previously designated, in consideration of the relinquishment of lands along the previously designated lines, the new lines to have the same proportional grant along them to be taken in the same manner as along the former lines.

These two acts are subsequent in date to the act under which the plaintiff claims, and the rule has long been settled that where different grants cover the same premises the earlier takes the title. There would be no reason why that rule should not be followed in the present case if the act of March 3, 1871, should be held to cover the premises in controversy.

It is, however, contended, in answer to this position of an earlier grant to the plaintiff, that the acts of March 3, 1865, and March 3, 1871, are to be treated, not as distinct acts, but simply as amendments to the act of March 3, 1857, and to be given an operation as of that date. We do not assent to this position. Though the act of March 3, 1865, by its new and additional grants, amended the previous act of 1857, its operation upon any lands previously reserved to aid in any work of internal improvement was expressly restrained. What was reserved before remained reserved afterwards. And the act of 1871 does not purport in any sense to be an amendment of the act of 1857. It simply authorizes the St. Paul and Pacific Railroad Company to change its lines in consideration of the relinquishment of certain lands. The old lines were to be given up, and all the benefits attached to them, in consideration of which new lines were authorized. The old lines were

not amended, but were abandoned. There was no partial release of the accompanying grants, but whatever rights attended the original lines were to be surrendered.

It is also urged against the priority of the plaintiff's claim that by the terms of the act making the grant to the Northern Pacific Railroad Company all subsequent grants prior to the definite location of its road are excepted.

Giving full force to this exception, we do not see that it has any application in the present case. It can only apply to grants of land which would otherwise be covered by the Northern Pacific grant, and the only grant which it is contended was in that situation, is the one accompanying the authority given by the act of March 3, 1871, to construct, in lieu of certain lines to be abandoned, a line from St. Cloud to a point of intersection with the line of what was termed the original grant, at or near Otter Tail or Rush Lake; though what was intended was the line projected in 1869, but which was never accepted by the Secretary of the Interior, because of its plain deviation from a direct line between the termini of the road authorized. The line of the original main grant was a long way distant from those lakes, to the south of them; and no line was located to intersect it, or authorized with that view. The line authorized, or supposed to be authorized, under the act of March 3, 1871, was distant many miles from the line projected in 1869, and the map of its definite location, approved by the Secretary of the Interior, was not filed with the commissioner of the general land office until December 20, 1871. The release required by the act of March 3, 1871, was not made by the St. Paul and Pacific Railroad Company until December 13, 1871, and a formal release to the United States by the company was not executed until the 19th of that month. It was only upon the execution of the release — whether that be deemed to have been on the 13th or 19th of December — that the act took effect. The act did not make a grant upon condition subsequent. There was no condition for a breach of which any forfeiture of a grant could be required, for no grant passed until the consideration for it, the relinquishment of old lines with the lands along them, was

given.   The transaction was in the nature of an exchange, by which the right was given to the company to construct new lines with proportional grants, in consideration of its relinquishing certain old lines, with their accompanying lands. The new rights were to vest with the release of the old rights. The transfer was to be mutual and simultaneous.   There was, therefore, no operative grant until there was an effective release, and whichever date be taken — whether December 13 or 19 — it was subsequent to the definite location of the Northern Pacific Railroad Company in Minnesota.   A map of that location, approved by the Secretary of the Interior, was filed, as stated above, in the office of the commissioner of the general land office on the 21st of the previous November.   No grant, therefore, was in existence of any lands to any other company, which are claimed by the plaintiff in this suit, at the time of the definite location of its route. The act of March 3, 1865, as already stated, is expressly restrained from in any way interfering with any lands previously reserved by Congress or any competent authority to aid in any work of public improvement.   Consequently, under that act no claim could be asserted that would in any way interfere with the grants to the Northern Pacific Railroad Company.

But independently of this conclusion, we are of opinion that the exception in the act making the grant to the Northern Pacific Railroad Company was not intended to cover other grants for the construction of roads of a similar character, for this would be to embody a provision which would often be repugnant to and defeat the grant itself.   *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway*, 97 U. S. 491, 498, 499.

Besides, the withdrawal made by the Secretary of the Interior of lands within the forty-mile limit, on the 13th of August, 1870, preserved the lands for the benefit of the Northern Pacific Railroad from the operation of any subsequent grants to other companies not specifically declared to cover the premises.   The Northern Pacific act directed that the President should cause the lands to be surveyed forty miles

in width on both sides of the entire line of the road, after the general route should be fixed, and as fast as might be required by the construction of the road, and provided that the odd sections of lands granted should not be liable to sale, entry or preëmption before or after they were surveyed, except by the company. They were therefore excepted by that legislation from grants, independently of the withdrawal by the Secretary of the Interior. His action in formally announcing their withdrawal was only giving publicity to what the law itself declared. The object of the withdrawal was to preserve the land unencumbered until the completion and acceptance of the road.

In the recent case of *Buttz* v. *Railroad Company*, 119 U. S. 55, 72, this court, speaking of the act making the grant to the Northern Pacific Company, said:

" Although the act does not require the officers of the Land Department to give notice to the local land officers of the withdrawal of the odd sections from sale or preëmption, it has been the practice of the department in such cases to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the department to give such information to the local land officers as may serve to guide aright those seeking settlements on the public lands; and thus prevent settlements and expenditures connected with them which would afterwards prove to be useless."

After such withdrawal, no interest in the lands granted can be acquired, against the rights of the company, except by special legislative declaration, nor, indeed, in the absence of its announcement, after the general route is fixed.

It is indeed contended that there is no evidence that any general route was fixed, meaning thereby the general route for the whole length of the road. If this were the fact, which is not conceded, the result would not be changed, as supposed by counsel. The contemplated railroad from Lake Superior to Puget Sound was about two thousand miles in length, and it was not expected that there should be a general designation of the whole route over this distance before any land should be withdrawn or any rights of the company should attach.

The general purpose of the act was accomplished if such reasonable portions of the general route were located as would intelligently guide the officers of the Land Department with reference to the patents to be issued for lands intended for the company. The withdrawal in any case would only extend along the route which was fixed, and a map of which was filed in the department.

As to the objection that no evidence was produced of any selection by the Secretary of the Interior from the indemnity lands to make up for the deficiencies found in the lands within the place limits, it is sufficient to observe that all the lands within the indemnity limits only made up in part for these deficiencies. There was, therefore, no occasion for the exercise of the judgment of the Secretary in selecting from them, for they were all appropriated.

Upon the whole case we are satisfied that the decree of the court below was correct, and it is accordingly

*Affirmed.*