## NORTHERN LUMBER COMPANY *v.* O'BRIEN.

APPEAL FROM THE UNITED STATES CIRCUIT COURT OF APPEALS.

No. 121. Argued December 7, 1906.—Decided January 14, 1907.

The grant to the Northern Pacific Railroad Company by the act of July 2, 1864, 13 Stat. 365, was *in præsenti*, although title did not attach to specific sections until they were identified, and the grant only included lands which, on that date, were not reserved, sold, granted, or otherwise appropriated; it did not include land then included within an existing and lawful withdrawal made in aid of an earlier grant for another road, although prior to the selection by the Northern Pacific it may have appeared that those lands were not within the place limits of the grant for such other road.

When a withdrawal order properly made ceases to be in force the lands withdrawn thereunder do not pass under a grant of unreserved, unsold or otherwise unappropriated lands but become part of the public domain to be disposed of under the general land laws or acts of Congress specially describing them.

139 Fed. Rep. 614, affirmed.

THE facts are stated in the opinion.

*Mr. Charles W. Bunn,* with whom *Mr. James B. Kerr* was on the brief, for appellant:

As the withdrawal upon general route for the Lake Superior and Mississippi Company was set aside in 1866, the lands were free public lands when the Northern Pacific line was definitely located in 1882; and they therefore fall literally within the Northern Pacific grant, unless their withdrawal was such as to forbid their inclusion on July 2, 1864, the date of the granting act, within the term "public lands" as used in that act.

To a withdrawal precision and certainty are as necessary as to a conveyance. The particular lands withdrawn must be certain or capable of being made certain. The local officers have no authority to make withdrawals, which must rest for their validity upon an order of the Secretary or of the Com-

missioner of the General Land Office. The withdrawal in this case of "a body of lands about twenty miles in width" was wholly indefinite and uncertain. It was not helped out by the map of general route transmitted with the withdrawal order to the local land office, because that map was wholly indefinite and uncertain.

Even conceding that the withdrawal was effective, it did not shield the lands from the operation of the subsequent grant to the Northern Pacific and did not deprive them of their character as public lands within the meaning of the Northern Pacific act.

The only requirement of the Northern Pacific grant relating to or defining the lands which at its date were embraced by the act of Congress being that they should be public lands, the question is whether a reservation from preëmption entry upon general route of another railway forbids their inclusion under that term.

There is a broad distinction between a reservation upon general route and one upon definite location, which latter sort of reservation the court considered in *Northern Pacific Railroad Company* v. *Musser-Sauntry Co.*, 168 U. S. 604. A reservation upon definite location is of indemnity land necessary (or supposed necessary) to fill losses in place limits. It is essential in order to save vested rights, not only as against entries under the land laws, but as against subsequent Congressional grants. The reservation upon general route involved in this case was, upon the contrary, not one to protect or save rights. It was merely to facilitate the operations of the public land department. It covered only place lands and those needed no protection from subsequent disposal by Congress, the settled doctrine being that priority of grant gives priority of right.

In *Menotti* v. *Dillon*, 167 U. S. 703, under an act providing "that in all cases where the State of California has heretofore made selections of any portion of the public domain in part satisfaction of any grant made to said State, by any act of

Congress, and has disposed of the same to purchasers in good faith under her laws, the lands so selected shall be, and hereby are, confirmed to said State," it was held that selections by the State of lands which had been previously withdrawn, for the benefit of a railroad company which had filed its map of general route, were selections from the "public domain" within the meaning of the above quoted act, and passed as such to the State of California under the provisions of said act notwithstanding such withdrawal. The same principle was involved in the recent cases of *United States* v. *Oregon & Cal. R. R. Co.*, 176 U. S. 28, and *Wilcox* v. *Eastern Oregon Co.*, 176 U. S. 51, which should be regarded as controlling and decisive of this appeal.

*Mr. J. N. Searles*, for the appellees, submitted:

The withdrawal proceeding was sufficient to take this land out of the class of "public lands" mentioned in the Northern Pacific grant. The word "about" used by the Commissioner in his withdrawal letter does not render his direction indefinite or uncertain. The rule is that when the context restrains and limits the meaning of the word "about," its use does not materially impair the certainty of a description. *Adams* v. *Harrington*, 114 Indiana, 66; *Corey* v. *Swagger*, 74 Indiana, 211; *Jones* v. *Plummer*, 2 Litt. 161; *Purinton* v. *Sedgley*, 4 Maine, 283–286; *Stevens* v. *McKnight*, 40 Ohio St. 341; *Balt. Land Soc.* v. *Smith*, 54 Maryland, 204; *Sanders* v. *Morrison*, 2 T. B. Mon. 109; *Shipp* v. *Miller*, 2 Wheat. 316; *Cutts* v. *King*, 5 Maine, 482; *Bodley* v. *Taylor*, 5 Cranch, 224; *Johnson* v. *Panel*, 2 Wheat. 206.

The Northern Pacific grant did not override the departmental withdrawal and thus include the land in question among the "public lands" referred to in that act.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit involves the title to the south half of the southeast quarter of section twenty-seven, township fifty-two north, range fifteen west, in the State of Minnesota.

The principal question in the case is whether the land in dispute was embraced by the grant of public lands made by Congress July 2, 1864, 13 Stat. 365, 367, c. 217, to the Northern Pacific Railroad Company in aid of the construction of a railroad and telegraph line from Lake Superior to Puget Sound. If it was not, then the decree of the Circuit Court dismissing the bill was right, as was that of the Circuit Court of Appeals affirming that decree.

By the act of May 5, 1864, 13 Stat. 64, c. 79, Congress made a grant of public lands to the State of Minnesota in aid of the construction of a railroad from St. Paul to the head of Lake Superior. This grant was vested in the Lake Superior and Mississippi Railroad Company, and that company on the seventh day of May, 1864, filed its map of *general* route. This map was accepted by the Land Department and a copy was transmitted May 26, 1864, to the proper local land office, which was informed of the approval by the Secretary of the Interior of a *withdrawal of lands for the Lake Superior and Mississippi* road, and that office was ordered to suspend, and it did suspend, "from preëmption, settlement and sale a body of land about twenty miles in width," as indicated on the filed map. The land in dispute was within the exterior lines of this 'general route of the Lake Superior and Mississippi road as defined by its map, and was *part of the land so withdrawn.*

*After* the acceptance of the map of general route of the Lake Superior and Mississippi Railroad, and *after* the withdrawal by the Land Department, for the benefit of that company, of the lands covered by that map, Congress, by the above act of July 2, 1864, 13 Stat. 365, 367, c. 217, declared "that there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of *public land*, not mineral, designated by odd numbers, to the

amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office;   .   .   ."

In 1866, the Lake Superior and Mississippi Railroad Company filed a map of the *definite* location of its road, from which it appeared that the land in dispute was outside of the place, indemnity and terminal limits of that road as thus located.

In 1882, the Northern Pacific Railroad Company filed its map of definite location, which showed that the particular lands here in dispute were in the place limits indicated by that map.

In 1883 the latter company filed in the proper office a list of lands which it asserted were covered by the grant made to it on July 2, 1864, and on that list, among other lands, were those here in dispute.

In 1901, the Commissioner of the Land Office refused to approve and rejected the list so far as the lands now in question were concerned, upon the ground that, although they appeared, after the definite location of the Northern Pacific Railroad, to be within the primary limits of the grant made for that road by the act of July 2, 1864, they "were *excepted from the operation of said grant* because they were, *at the date of the passage of said act,* within ten miles of the probable route of the Lake Superior and Mississippi Railroad in aid of the construction of which a grant was made by the act of May 5, 1864, and *were embraced within the withdrawal of May* 26th, 1864, made on account of the last-mentioned grant." The question was taken on appeal to the Secretary of the Interior, and he also rejected the above list, rendering a decision under date of

July 16, 1901, affirming the decision of the Commissioner—the Secretary ruling that as these lands were, *at the date of the grant to the Northern Pacific Railroad Company*, already "included within *an existing and lawful withdrawal* made in aid of a prior grant," they were not to be deemed "public lands" when the Northern Pacific grant of 1864 was made, and, consequently, were not embraced by that grant. The Secretary held that the fact that a right under a prior grant did not eventually attach to the lands here in question was immaterial; "first, because the act of July 2, 1864, was a grant *in præsenti*, and second, because a reservation on account of a prior grant will defeat a later grant like that of July 2, 1864, whether the lands are needed in satisfaction of the prior grant or not." 31 L. D. 33. Under that decision the above list filed by the Northern Pacific Railroad Company was formally and finally cancelled, and these lands were never assigned to it by the Land Department.

Although the stipulation of the parties as to the facts is very lengthy, those here stated are sufficient to present the point upon which, it is agreed, the decision of the case depends.

We have seen that at the date of the grant of July 2, 1864, to the Northern Pacific Railroad Company the particular land in dispute was within the lines designated by the accepted map of the *general* route of the Lake Superior and Mississippi Railroad; and that the grant for the Northern Pacific Railroad was of "public land." Was the land here in dispute *public* land *at the date of the passage* of that act? If by reason of its having been then withdrawn by the Land Department from preëmption, settlement and sale, it was not at the date of the Northern Pacific grant to be deemed public land, did that grant attach to it when the Northern Pacific road was definitely located in 1882? These questions were answered in the negative by both the Circuit Court and the unanimous judgment of the Circuit Court of Appeals. *Northern Lumber Co.* v. *O'Brien &c.*, 134 Fed. Rep. 303; *S. C.*, 139 Fed. Rep. 614.

It has long been settled that the grant to the Northern

Pacific Railroad Company by the act of 1864 was one *in praesenti;* that is, the company took a present title, as of the date of the act, to the lands embraced by the terms of the grant; the words "that there be, and hereby is, granted" importing "a transfer of present title, not a promise to transfer one in the future." In *St. Paul & Pacific* v. *Northern Pacific,* 139 U. S. 1, 5, the court said "that the route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but when once identified the .title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one *in praesenti;* that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route. This is the construction given to similar grants by this court, where the question has been often considered; indeed, it is so well settled as to be no longer open to discussion. *Schulenberg* v. *Harriman,* 21 Wall. 44, 60; *Leavenworth, Lawrence &c. Railroad Co.* v. *United States,* 92 U. S. 733; *Missouri, Kansas &c. Railway Co.* v. *Kansas Pacific Railway Co.,* 97 U. S. 491; *Railroad Co.* v. *Baldwin,* 103 U. S. 426." The same principle was reaffirmed in *Bardon* v. *Northern Pacific Railroad,* 145 U. S. 535, 543, and in many other cases which are familiar to the profession and need not be cited.

Again, no lands passed that were not, at the date of the grant, public land; that is, lands "open to sale or other disposition under general laws," not lands "to which any claims or rights of others have attached." *Bardon* v. *Northern Pacific Railroad,* above cited. At the time of the grant of 1864 to the Northern Pacific Railroad Company the lands here in dispute were, as we have seen, among those *withdrawn* by the Land Department from preëmption, settlement and sale, and were held specifically under the grant of May 5, 1864, for the Lake Superior and Mississippi Railroad. They were not, therefore, public lands embraced by the later grant to the other company.

The grant of the Northern Pacific Railroad Company spoke
as of the date of the act of July 2, 1864; and that company
did not acquire any title to these lands, then withdrawn, by
reason of the fact that when its line, at a subsequent date,
was definitely located they had become freed from the grant
made by the act of May 5, 1864, to the State of Minnesota.
Being at the date of the grant of July 2, 1864, *under the opera-
tion of an order of withdrawal by the Land Department,* they
were not in the category of lands embraced by that grant of
"public lands." When the withdrawal order ceased to be
in force the lands so withdrawn did not pass under the later
grant but became a part of the public domain, subject to be
disposed of under the general land laws, and not to be claimed
under any railroad land grant. There is no escape from this
conclusion under the adjudged cases.

In *Kansas Pacific Railroad Co.* v. *Dunnmeyer,* 113 U. S.
629, in which the attempt was made to include within a railroad
grant lands to which a homestead claim had previously at-
tached, but which claim had ceased to exist when the line of the
railroad was definitely fixed, the court, speaking by Mr. Jus-
tice Miller, said: "No attempt has ever been made to include
lands reserved to the United States, which reservation after-
wards ceased to exist, within the grant, though this road, and
others with grants in similar language, have more than once
passed through military reservations, for forts and other
purposes, which have been given up or abandoned as such
reservations and were of great value; nor is it understood
that *in any case where lands had been otherwise disposed of their
reversion to the Government brought them within the grant.* . ."

In *Bardon* v. *Northern Pacific Railroad,* above cited, Mr.
Justice Field, delivering the unanimous judgment of the court,
said: "In the *Leavenworth case*" (92 U. S. 733) "the appellant,
the railroad company, contended that the fee of the land was
in the United States, and only a right of occupancy remained
with the Indians; that under the grant the State would hold
the title subject to their right of occupancy; but as that had

been subsequently extinguished, there was no sound objection to the granting act taking full effect. The court, however, adhered to its conclusion, that the land covered by the grant could only embrace lands which were at the time public lands, free from any lawful claim of other parties, unless there was an express provision showing that the grant was to have a more extended operation, citing the decision in *Wilcox* v. *Jackson,* 13 Pet. 496, 498, to which we have referred above, *that land once legally appropriated to any purpose was thereby severed from the public domain and a subsequent sale would not be construed to embrace it, though not specially reserved.* And of the Indians' right of occupancy it said, that this right, with the correlative obligation of the Government to enforce it, negatived the idea that Congress, even in the absence of any positive stipulation to protect the Osages, intended to grant their land to a railroad company, either absolutely or *cum onere.* 'For all practical purposes,' the court added, 'they owned it; as the actual right of possession, the only thing they deemed of value, was secured to them by treaty, until they should elect to surrender it to the United States.' Three justices, of whom the writer of this opinion was one, dissented from the majority of the court in *The Leavenworth case;* but the decision has been uniformly adhered to since its announcement, and this writer, after a much larger experience in the consideration of public land grants since that time, now readily concedes that the rule of construction adopted, that, in the absence of any express provision indicating otherwise, a grant of public lands only applies to lands which are *at the time* free from existing claims, is better and safer, both to the Government and to private parties, than the rule which would pass the property subject to the liens and claims of others. The latter construction would open a wide field of litigation between the grantees and third parties."

Again, in the same case, where the contention was that the Northern Pacific grant embraced lands to which a preëmption claim had previously attached, but which claim was cancelled

after the date of that grant, the court said: "That preëmption entry remained of record until August 5, 1865, when it was cancelled, but this was after the date of the grant to the Northern Pacific Railroad Company, and also after the dates of several grants made to the State of Wisconsin to aid in the construction of railroad and telegraph lines within that State. *The cancellation, as already said, did not have the effect of bringing the land under the operation of the grant to the Northern Pacific Railroad Company; it simply restored the land to the mass of public lands*, to be dealt with subsequently in the same manner as any other public lands of the United States not covered by or excepted from the grant."

In *United States* v. *Southern Pacific Railroad,* 146 U. S. 570, 606, this court, speaking by Mr. Justice Brewer, said: "Indeed, the intent of Congress in all railroad grants, as has been understood and declared by this court again and again, is that such grant shall operate at a fixed time, and shall take only such lands as *at that time* are public lands, and, therefore, grantable by Congress, and is never to be taken as a floating authority to appropriate all tracts within the specified limits which at any subsequent time may become public lands." In *Whitney* v. *Taylor,* 158 U. S. 85, 92, Mr. Justice Brewer, again speaking for the court, said: "That when on the records of the local land office there is an existing claim on the part of an individual under the homestead or preëmption law, which has been recognized by the officers of the Government and has not been cancelled or set aside, the tract in respect to which that claim is existing *is excepted from the operation of a railroad land grant* containing the ordinary excepting clauses, and this notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the Government at its own suggestion or upon the application of other parties. It was not the intention of Congress to open a controversy between the claimant and the railroad company as to the validity of the former's claim; it was enough that the claim existed, and the question of its validity was a matter to be settled between

the Government and the claimant, in respect to which the railroad company was not permitted to be heard." In *Spencer* v. *McDougal*, 159 U. S. 62, 65, the court referred to *Wolcott* v. *Des Moines Co.*, 5 Wall. 681, in which the question arose whether a grant of public lands, on each side of Des Moines River, in aid of navigation, terminated at the mouth of Raccoon Fork or extended along the whole length of the river to the northern boundary of the State, and said: "The land department ordered that lands the whole length of the river within the State should be withdrawn from sale. In the course of subsequent litigation it was decided by this court that the grant terminated at the mouth of the Raccoon River. But in the case cited it was held that the withdrawal by the land department of lands above the mouth of the Raccoon River was valid, and that a subsequent railroad grant, with the ordinary reservation clause in it, *did not operate upon lands so withdrawn.*" So, in *Northern Pacific Railroad* v. *Musser-Sauntry Co.*, 168 U. S. 604, 607, 611: "But a single question is presented in this case, and that is whether the withdrawal from sale by the Land Department in March, 1866, of lands within the indemnity limits of the grant of 1856 and 1864 exempted such lands from the operation of the grant to the plaintiff. It will be perceived that the grant in aid of the defendant railway company was prior in date to that to the plaintiff, and that before the time of the filing of plaintiff's map of general route and definite location the lands were withdrawn for the benefit of the defendant. The grant to the plaintiff was only of lands to which the United States had 'full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, at the time the line of said road is definitely fixed. The withdrawal by the Secretary in aid of the grant to the State of Wisconsin was valid and operated to withdraw the odd-numbered sections within its limits from disposal by the land officers of the Government under the general land laws. The act of the Secretary was in effect a reservation. *Wolcott* v. *Des Moines Co.*, 5 Wall. 681; *Wolsey* v.

*Chapman,* 101 U. S. 755, and cases cited in the opinion; *Hamblin* v. *Western Land Company,* 147 U. S. 531, and cases cited in the opinion. It has also been held that such a withdrawal is effective against claims arising under subsequent railroad land grants. *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad,* 139 U. S. 1, 17, 18; *Wisconsin Central Railroad* v. *Forsythe,* 159 U. S. 46, 54; *Spencer* v. *McDougal,* 159 U. S. 62. . . . All that we here hold is, that when a withdrawal of lands within indemnity limits is made in aid of an earlier land grant and made prior to the filing of the map of definite location by a company having a later grant—the latter having such words of exception and limitation as are found in the grant to the plaintiff—*it operates to except the withdrawn lands from the scope of such later grant.*" The doctrines of these cases were recognized in the recent case of *Northern Pacific Railway* v. *Lacey,* 174 U. S. 622.

In view of these decisions it is clear that as the lands in dispute were, at the date of the grant to the Northern Pacific Railroad Company, withdrawn, of record, for the benefit of the Lake Superior and Mississippi Railroad, under a prior grant, they were not public lands within the meaning of the later grant, and did not come under it, when or because it was subsequently ascertained that they were without the line of the definite location of the road of the Lake Superior Railroad Company, and within the place limits of the Northern Pacific as defined by its map of definite location. When freed from the operation of the accepted map of general route filed by the Lake Superior and Mississippi Railroad Company, they did not come under the operation of the later grant to the Northern Pacific Railroad, but became a part of the public lands constituting the public domain and subject only to be disposed of under the general laws relating to the public lands. If, by the act of July 2, 1864, or before the line of the Northern Pacific Railroad was definitely located, Congress had, in terms, appropriated, for the benefit of that road, any of the lands embraced in the general route of the

other road, a different question would be presented. But
it did not do so.   It only granted for the benefit of the Northern
Pacific Railroad lands which *then*, July 2, 1864, were public
lands, and no lands were public lands, within the meaning of
Congress, which, at that time, were withdrawn by the Land De-
partment; that is, reserved for the purposes of a prior grant
although such reservation turned out to have been a mistake.

The suggestion is made in this connection that the order of
the Land Department was too uncertain and indefinite to have
any legal force, because the direction to the local land office
was to suspend from preëmption, settlement and sale "a
body of land *about* twenty miles in width."   We deem this
suggestion without merit.  The order for withdrawal referred
to the diagram or map showing the road's probable route; and
it is agreed that the lands in dispute are coterminous and
within ten miles of the line of the general route of the Lake
Superior and Mississippi Railroad, as defined by the diagram
or map filed.  The map, however indefinite, was intended
to cover these lands.  It sufficiently indicated these lands
and the probable route of the road, and that was enough.

Many cases are called to our attention which are supposed
to militate against the views we have here expressed.   We have
examined those referred to and do not perceive that any one
of them decided the particular question now before us.   No
one of them holds that a grant, *in præsenti*, of public lands,
with the ordinary reservations, embraces lands which, at the
date of such grant, are under the operation of a formal order
of the Land Department, of record, withdrawing them for the
benefit of a prior grant in the event they should be needed for
the purposes of such grant.   Nor do any of them hold that
the subsequent cancellation of such withdrawal order had the
effect to bring them under the operation of a later grant of
public lands.  It is said that *United States* v. *Oregon & Cal.
R. R. Co.*, 176 U. S. 28, and *Wilcox* v. *Eastern Oregon Co.*,
176 U. S. 51, should be regarded as controlling and decisive
of this case for the appellant.   We do not think so.   The

principal point decided in those cases was that nothing in the act of 1864 prevented Congress by legislation from appropriating for the benefit of other railroad corporations lands that might be or were embraced within the *general* route of the Northern Pacific Railroad; and this for the reason that an accepted map of general route only gave the company filing it an inchoate right and did not pass title to specific sections until they were identified by a definite location of the road. Besides, in neither case was there in force, at the date of the later grant, an accepted, effective order of the Land Department withdrawing the lands there in dispute pursuant to an accepted map of the *general* route of the Northern Pacific Railroad. If there had been an order of that kind, it would still have been competent for Congress to dispose of the lands, within such general route, as it saw proper, at any time prior to the definite location of the road under the later grant. In conformity with prior decisions it was so adjudged in the two cases above cited. Those cases did not adjudge that a grant of "public land," with the usual reservations, embraced any lands which, *at the time,* were formally withdrawn by the Land Department from preëmption, settlement or sale, for the benefit of a prior grant.

We are of opinion that the Circuit Court and the Circuit Court of Appeals correctly interpreted the decisions of this court and did not err as to the law of the case. The judgment below must, therefore, be affirmed.

*It is so ordered.*