## DESERET SALT COMPANY *v.* TARPEY.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 96. Argued and submitted November 24, 1891. — Decided December 21, 1891.

The grant of public land to the Central Pacific Railroad Company by the acts of July 1, 1862, 12 Stat. 489, c. 120, and July 2, 1864, 13 Stat. 356, c. 216, was a grant *in præsenti ;* and the legal title to the granted land, as distinguished from merely equitable or inchoate interests, passed when the identification of a granted section became so far complete as to authorize the grantee to take possession.

*Rutherford* v. *Greene,* 2 Wheat. 196 cited and followed.

Patents were issued, not for the purpose of transferring title, but as evidence that the grantee had complied with the conditions of the grant, and that the grant was, to that extent, relieved from the possibility of forfeiture for breach of its conditions.

*Wisconsin Central Railroad Co.* v. *Price County,* 133 U. S. 496, 510 approved.

The provision in the statute, requiring the cost of surveying, selecting and conveying the land to be paid into the treasury before a patent could issue, does not impair the force of the operative words of transfer in it.

The railroad company could maintain an action for the possession of land so granted before the issue of a patent, and could transfer its title thereto by lease, so as to enable its lessee to maintain such an action.

THE court stated the case as follows:

This is an action of ejectment by D. P. Tarpey, the plaintiff below, against the Deseret Salt Company, a corporation created under the laws of Utah, for certain parcels of land in that Territory, described in the complaint as the northwest quarter of fractional section nine (9), in township eleven (11)

north, range nine (9) west, Salt Lake base and meridian, and the northeast quarter and the southwest quarter of said section, in part covered with water; in all, three hundred and eighty acres, more or less. The greater part of these lands lie on the border of Great Salt Lake, a body of water in that Territory of nearly ninety miles in extent, and in breadth varying from twenty to thirty miles, which holds in solution a large quantity of common salt. The remaining lands in the section are covered by the lake.

In 1875 one Barnes took possession of a portion of these lands and began the construction of improvements and the erection of machinery to raise the water of the lake and conduct it into ponds or excavations, partly natural and partly made by him, for the purpose of evaporating the water by exposing it to the sun, and thus producing salt. He commenced manufacturing salt in this way in 1876 or 1877, and continued in the business until September, 1883, when he sold and transferred the lands and improvements to the defendant, The Deseret Salt Company, which at once went into possession and continued in the manufacture.

The plaintiff derives his title from the Central Pacific Railroad Company, a corporation of California, to which a grant of land was made by the act of Congress of July 1, 1862, embracing the premises in controversy. A greater part of its lands lying in Utah was leased by the company to the plaintiff, on the 7th of August, 1885, for five years, for the annual rent of five thousand dollars, and in consideration of certain covenants in relation to the property which he undertook to perform. By one of these covenants he stipulated to begin to reduce the premises to possession, and to continue in that effort until he should be in the actual possession of the whole, and for that purpose to commence and prosecute any necessary or proper actions at law, or other legal proceedings. This lease covered the premises in controversy.

On the 20th of October, 1868, the map of the definite location of the line of the railroad of the company, to be constructed under the above grant, was filed in the Interior Department and accepted, as required by the act of Congress.

The premises in controversy constitute an alternate section of the land within ten miles of the road, and its east, west and north lines were surveyed by the United States in 1871. Its southern line, lying in the lake, had not been run. The selection list of lands for patent by the company, filed in the land office at Salt Lake City, which was produced in evidence, included the surveyed lands of the section, and showed that the costs of selecting, surveying and conveying them had been paid. There was no evidence of any application for any other lands in the section, and no costs were paid or tendered for their selection, survey and conveyance.

The plaintiff also proved the incorporation in June, 1861, of the Central Pacific Railroad Company of California; its amalgamation and consolidation in June, 1870, with the Western Pacific Railroad Company, and, in August, 1870, with the California and Oregon Railroad Company, the San Francisco, Oakland and Alameda Railroad Company, and the San Joaquin Valley Railroad Company. In the different articles of amalgamation a conveyance was made by the parties of their several interests to the new amalgamated company, as follows: "And the said several parties, each for itself, hereby sells, assigns, transfers, grants, bargains, releases and conveys to the said new and consolidated company and corporation, its successors and assigns, forever, all its property, real, personal, and mixed, of every kind and description." These instruments were all properly recorded.

The court informed the jury of the general nature of the grant to the company by the act of Congress of July 1, 1862, and the amendatory act of July 2, 1864, and instructed them, substantially, that the line of the road, which the company was to construct under the grant, became definitely fixed upon its filing with the Department of the Interior its map of definite location, designating the general route of the road; and that thereupon the beneficial interest in the land vested in the company, by relation back to the date of the act of Congress; and that as it was agreed that the lands in controversy were a portion of an odd alternate section, within the twenty mile limit of the grant, they passed to and vested in the company,

at the time of the filing of that map, unless they had been previously sold, reserved or otherwise disposed of by the United States, or a preëmption, homestead, swamp-land or other lawful claim had attached to them, or they were known to be mineral lands or were returned as such; and further, that the lease, bearing date the seventh day of August, 1885, from that company to the plaintiff, for five years from the first day of January, 1886, gave to him the right of immediate possession of the lands, unless they were within some of the exceptions of the grant.

 The defendant company denied that the title to the lands in controversy had passed to the Central Pacific Railroad Company, the lessor of the plaintiff, and requested the court to instruct the jury that the plaintiff had not shown any grant, or conveyance by deed or other written instrument, sufficient to invest him with title to the lands.  This instruction was refused, and the defendant excepted.  The jury returned a verdict in favor of the plaintiff for the possession of the lands described in the complaint and for five hundred dollars for their use and occupation.  Judgment being entered thereon the case was carried to the Supreme Court of the Territory and there affirmed.  From the judgment of the latter court the case is brought here on a writ of error.

 *Mr. Parley L. Williams* for plaintiff in error.

There was no evidence whatever showing or tending to show that the government had issued patents for any of the lands in question, nor was there any proof that the company had made any application to select or have conveyed to it any lands in said fractional section except the northwest quarter, the northwest quarter of the northeast quarter, and the northwest quarter of the southwest quarter; being two hundred and forty acres only, and the whole of the land in said fractional section which had been surveyed; yet the recovery in this case was for the whole tract sued for, the unsurveyed as well as the surveyed portions of this fractional section.

As to so much of this land as was unsurveyed and for which

the costs of surveying have not been paid, it is submitted with great confidence that by the true construction of the act of Congress granting these lands, the title remains in the government, and the defendant in error has not therefore, in any view of the case, a title that will support ejectment. In this connection the court is cited to the following cases in this court. *Railway Co.* v. *Prescott*, 16 Wall. 603; *Railway Co.* v. *McShane*, 22 Wall. 444; *Northern Pacific Railroad Co.* v. *Traill County*, 115 U. S. 600.

This case presents a question regarding the nature of the rights secured to the Pacific Railroads by virtue of the grant of lands to them that has not hitherto been passed on by this court, and one of great moment to a large part of the public in the region affected by these grants.

*Mr. Attorney General* and *Mr. John B. Cotton* for defendant in error.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The only questions which appear in this case to have elicited much discussion in the court below, relate to the title of the Central Pacific Railroad Company to the lands granted by the acts of Congress of July 1, 1862, and July 2, 1864, upon the filing of a map of the definite location of its contemplated road with the Secretary of the Interior and its acceptance by him. Was it sufficient to enable the lessee of the company to maintain an action for the possession of the demanded premises? The lessee can, of course, as against a stranger, have no greater right of possession than his lessor. On the one hand it is contended, with much earnestness, that upon the filing of the map of definite location of the proposed road, and its acceptance by the Secretary of the Interior, a legal title vested in the grantee to the alternate odd sections, subject to various conditions, upon a breach of which the title may be forfeited, but that until then their possession may be enforced by the grantee. On the other hand, it is insisted, with equal energy,

that the grant gives only a promise of a title when the work contemplated is completed, and that until then possession of the lands cannot be claimed.

An examination of the granting act, and the ascertainment thereby of the intention of Congress, so far as practicable, will alone enable us to give a satisfactory solution to these positions.

The act of Congress of July 1, 1862, 12 Stat. 489, c. 120, provides for the incorporation of the Union Pacific Railroad Company, and makes a grant of land to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean. Its provisions, grants and obligations, specially relate in terms to that company; but other railroad companies are embraced within the objects of the act, and the clauses mentioning and referring to the Union Pacific Railroad Company are made applicable to them. Thus by the ninth section the Central Pacific Railroad Company of California was authorized to construct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of California, "upon the same terms and conditions in all respects" as were provided for the construction of the railroad and telegraph line of the Union Pacific. And by the tenth section of the act that company, after completing its road across California, was authorized to continue the construction of its road and telegraph line through the Territories of the United States to the Missouri River, on the terms and conditions provided in the act in relation to the Union Pacific Railroad Company, or until its road should meet and connect with the road of that company. An equal grant of land, and of like extent and upon like conditions, was made to the Central Pacific Railroad Company of California, as was in terms made to the Union Pacific Railroad Company. By the same law the rights and obligations of both must be determined.

By the third section the grant was made. Its language is "*that there be and is hereby granted, to the said company,*" for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transporta-

tion of the mails, troops, munitions of war and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached, at the time the line of said road is definitely fixed: *Provided*, That all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, the timber thereon is hereby granted to said company." The act of July 2,1864, 13 Stat. 356, 357, c. 216, enlarged the amount of the grant to ten alternate sections on each side of the road.

By the fourth section, as amended by section 6 of the act of 1864, it was enacted: "That whenever said company shall have completed not less than *twenty* consecutive miles of any portion of said railroad and telegraph line, ready for the service contemplated by this act, and supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering places, depots, equipments, furniture and all other appurtenances of a first-class railroad, the rails and all the other iron used in the construction and equipment of said road to be American manufacture of the best quality, the President of the United States shall appoint three commissioners to examine the same and report to him in relation thereto; and if it shall appear to him that not less than *twenty* consecutive miles of said railroad and telegraph line have been completed and equipped in all respects as required by this act, then, upon certificate of said commissioners to that effect, patents shall issue conveying the right and title to said lands to said company, on each side of the road as far as the same is completed, to the amount aforesaid; and patents shall in like manner issue as each *twenty* miles of said railroad and telegraph line are completed, upon certificate of said commissioners."

By the terms of the act making the grant the contention of the defendant is not supported. Those terms import the transfer of a present title, not one to be made in the future. They are that "there be and is hereby granted" to the

company every alternate section of the lands. No partial or limited interest is designated, but the lands themselves are granted, as they are described by the sections mentioned. Whatever interest the United States possessed in the lands was covered by those terms, unless they were qualified by subsequent provisions, a position to be presently considered.

In a great number of cases grants containing similar terms have been before this court for consideration. They have always received the same construction, that unless the terms are restricted by other clauses, they import a grant *in præsenti*, carrying at once the interest of the grantor in the lands described. *Schulenburg* v. *Harriman*, 21 Wall. 44; *Leavenworth, Lawrence & Galveston Railroad* v. *United States*, 92 U. S. 733.

In *Wisconsin Central Railroad Co.* v. *Price County*, 133 U. S. 496, 507, referring to the different acts of Congress making grants to aid in the construction of railroads, we stated that they were similar in their general provisions, and had been before this court for consideration at different times, and of the title they passed we said : " The title conferred was a present one, so as to insure the donation for the construction of the road proposed against any revocation by Congress, except for non-performance of the work within the period designated, accompanied, however, with such restrictions upon the use and disposal of the lands as to prevent their diversion from the purposes of the grant."

As the sections granted were to be within a certain distance on each side of the line of the contemplated railroad, they could not be located until the line of the road was fixed. The grant was, therefore, in the nature of a "float;" but, when the route of the road was definitely fixed, the sections granted became susceptible of identification, and the title then attached as of the date of the grant, except as to such parcels as had been in the meantime under its provisions appropriated to other purposes.

That doctrine is very clearly stated in the Leavenworth Case cited above, where the language of the grant was identical with that of the one under consideration, and the court said:

"'There be and is hereby granted' are words of absolute dona-tion and import a grant *in præsenti*. This court has held that they can have no other meaning, and the land department, on this interpretation of them, has uniformly administered every previous similar grant. They vest a present title in the State of Kansas, (the grantee named,) though a survey of the lands and a location of the road are necessary to give precision to it and attach it to any particular tract. The grant then becomes certain, and, by relation, has the same effect upon the selected parcels as if it had specifically described them."

The terms used in the granting clause of the act of Congress, and the interpretation thus given to them, exclude the idea that they are to be treated as words of contract or promise rather than, as they naturally import, as words indicating an immediate transfer of interest. The title transferred is a legal title, as distinguished from an equitable or inchoate interest.

The case of *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196, well illustrates the nature of the title. In 1782 the State of North Carolina passed an act providing "that twenty-five thousand acres of land shall be allotted for and given to Major General Nathaniel Greene," within the bounds of a tract reserved for the use of the army, to be laid off by commission-ers designated in the act, as a mark of the high sense the State entertained of the extraordinary services of that brave and gallant officer. The commissioners allotted the twenty-five thousand acres, and in 1783 caused a survey of them to be made and returned to the proper office. One Rutherford claimed under a subsequent entry five thousand acres of the tract, and instituted a suit to establish his claim. The case turned upon the validity of Greene's title, and the date at which it commenced. It was contended by Rutherford's counsel that the words of the act gave nothing; that they were in the future and not in the present tense; and indicated an intention to give in future, but created no present obliga-tion on the State, nor present interest in General Greene. But the court, speaking by Chief Justice Marshall, answered,

that it thought differently ; that the words were words of abso-
lute donation, not indeed of any specific land, but of twenty-
five thousand acres in the territory reserved for the officers
and soldiers; that as the act of setting apart that quantity to
General Greene was to be performed in the future, the words
directing it were necessarily in the future tense, but that noth-
ing could be more apparent than the intention of the legisla-
ture to order the commissioners to make the allotment, and to
give the land when allotted to General Greene. And the
court held that the general gift of twenty-five thousand acres,
lying in the reserved territory, became by the survey a par-
ticular gift of that quantity contained in the survey ; and
concluded an elaborate examination of the title by stating
that it was clearly and unanimously of the opinion that the
act of 1782 vested a title in General Greene to twenty-five
thousand acres of land, to be laid off within the bounds
allotted to the officers and soldiers, and that the survey made
and returned in pursuance of that act gave precision to that
title and attached it to the land surveyed.

It would therefore seem clear, that the title which passed
under the act of Congress by the grant of the odd sections
became by their identification so far complete as to authorize
the grantee to take possession and make use of the lands ; and
in the exercise of that authority the grantee took possession
from time to time as the lands became identified by the loca-
tion of the line of the road, and made sales of parcels of
the lands, and executed mortgages on other parcels with sec-
tions of the road constructed, for the purpose of raising
money to meet expenses already incurred and which might
thereafter be required for the completion of the road; and
such mortgages were authorized by Congress.

But it is contended that the natural import of the granting
terms of the act is qualified and restricted by its fourth section,
which, as amended by the act of 1864, provides that, upon the
completion of not less than twenty consecutive miles of the
road and telegraph line in the manner required, and their ac-
ceptance by the president, upon the report of commissioners
appointed to examine the work, patents shall issue to the com-

pany conveying the right and title to said lands on each side of the road as far as the same is completed.

The question naturally arises as to the necessity for patents, if the title passed by the act itself upon the definite location of the road, when the alternate sections granted had become identified? We answer that objection by saying that there are many reasons why the issue of the patents would be of great service to the patentees, and by repeating substantially what we said on that subject in *Wisconsin Railroad Co.* v. *Price County*, 133 U. S. 496, 510. While not essential to transfer the legal right the patents would be evidence that the grantee had complied with the conditions of the grant, and to that extent that the grant was relieved from the possibility of forfeiture for breach of its conditions. They would serve to identify the lands as coterminous with the road completed; they would obviate the necessity of any other evidence of the grantee's right to the lands, and they would be evidence that the lands were subject to the disposal of the railroad company with the consent of the government. They would thus be in the grantee's hands deeds of further assurance of his title, and, therefore, a source of quiet and peace to him in its possession.

There are many instances in the reports, as there stated, where patents have been required and issued, although the title of the patentee had been previously recognized and confirmed. *Langdeau* v. *Hanes*, 21 Wall. 521, 529, is an instance of that kind. In that case there had been a previous confirmation, to the heirs of one Tongas of a claim to a tract of land in the French and Canadian settlement of St. Vincents in the Northwestern Territory, conveyed by Virginia to the United States in 1793. This claim was confirmed by commissioners appointed by Congress under the act of 1804, and their decision was confirmed by the act of Congress of March 3, 1807, but no patent, for which this last act provided upon a location and survey of the claim, was issued for the tract at that time. One was, however, issued for it in 1872, upon a survey made in 1820, and the question was whether a new title was acquired by that patent, or whether the old title was good from the confirmation. It was held that the old title was good from the con-

firmation, if the claim was to a tract of defined boundaries, or capable of identification; but if the claim was to quantity, and not to a specific tract, the title became perfect when the quantity was segregated by the survey of 1820; and to explain the subsequent issue of a patent in 1872, this court said: "In the legislation of Congress a patent has a double operation. It is a conveyance by the government, when the government has any interest to convey; but where it is issued upon the confirmation of a claim of a previously existing title it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer from the government."

Whilst a legal title to the sections designated, as distinguished from a merely equitable or inchoate interest, passed to the railroad company by the act of Congress, upon the definite line of the road being once established, by which the sections could be ascertained and identified, the lands could not be disposed of by the company without the consent of Congress, except as each twenty-mile section of the road was completed and accepted by the President, so as to cut off the right of the United States to compel the application of the lands to the purposes for which they were granted, or to prevent their forfeiture in case of the company's failure to perform the conditions of the grant. The lands were granted to aid in the construction of the railroad and telegraph line, and it is manifest, from different provisions of the act, that Congress intended to secure this application of them. Whatever disposition might be made by the company of the lands after they became, by the definite location of the road, capable of identification, they were subject to the control of Congress, either to compel their application for the construction of the road contemplated, or to enforce their forfeiture if the road was not completed as required by the act. The application of the lands to the construction would not, of itself, operate to transfer the title; it would only remove the restriction upon the use and disposition of the title already possessed.

But it is unnecessary to consider what power of disposition the company would possess in advance of the construction of the road, for that road was entirely completed years before the execution of the lease to the plaintiff in this case, in August, 1885.

It is also urged that the title of the government to the lands in controversy was retained until the cost of selecting, surveying and conveying the whole of them was paid. In support of this position the twenty-first section of the act of July 2, 1864, is referred to, which provides that before any land granted by the act shall be conveyed to any company or party entitled thereto, there shall first be paid into the Treasury of the United States the cost of surveying, selecting and conveying the same. The object of this provision was to preserve to the government such control over the property granted as to enable it to enforce the payment of these costs, and, for that purpose, to withhold its patents from the parties entitled to them until such payment. The act of 1862, in its, fourth section, as amended in 1864, speaks of patents issuing " conveying the right and title." to the lands upon the completion of every section of not less than twenty miles, to the satisfaction of the President; and the twenty-first section of the act of 1864 only directs the withholding of these evidences of the transfer of title until payment is made for the selection, survey and conveyance of the land. Neither the issue of the patents nor any sale for taxes by State authority is permitted until such payment, thereby preserving unimpaired the lien contemplated.

We do not think the provision was designed to impair the force of the operative words of transfer in the grants of the United States, or invalidate the numerous conveyances by sale and mortgage of the lands made by the railroad company, with the express or implied assent of the government.

Besides, in this case, the exterior limits of the section containing the lands in controversy, which are above the waters of the lake, were surveyed in 1871, and the costs of selecting, surveying and conveying the legal subdivisions as described by that survey were paid at the time of selection by the com-

pany. The lines of the lands under the water have not been run, but are easily traceable by reference to the lines actually surveyed. The possession of the lands under the lake appears to have always accompanied the possession of the lands on its border. No contest was made against their recovery if a right of possession was shown to the border lands.

From the view of the interest conveyed by the grant which we have expressed, we are satisfied that the company could maintain an action for the possession of the premises in controversy, and that its lessee, the plaintiff herein, was possessed of the same right. The judgment must, therefore, be

*Affirmed.*