CITIZENS COMMITTEE TO SAVE the LAND GRANT RAILROADS, et al., Plaintiffs-Appellants,

v.

BURLINGTON NORTHERN, INC., et al., Defendants-Appellees.

No. 82–3075.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 5, 1983.

Decided June 22, 1983.

---

**15.** We deny CGP's request for attorney's fees for this appeal. Each party is ordered to bear its own costs.

Daniel H. Smith, Smith, Kaplan & Salmi, Seattle, Wash., for plaintiffs-appellants.

Louis A. Harris, Seattle, Wash., for defendants-appellees.

Before BROWNING, Chief Judge, and FLETCHER and PREGERSON, Circuit Judges.

FLETCHER, Circuit Judge:

This is a suit by several unions, creditors, and shareholders of Burlington Northern, Inc. (Burlington) and an unincorporated association of customers of Burlington to enjoin Burlington from consummating a corporate reorganization.[1] After the complaint was filed, Burlington created a holding company of which a railroad-based operating company is one subsidiary. Burlington then began the transfer of certain assets of the former Burlington corporation to the holding company and its non-railroad subsidiaries. Plaintiffs contend that these transactions violate the terms of the land grant act that established Burlington's corporate predecessor and the terms of various Burlington bond indentures.[2] The district court dismissed these claims on grounds of lack of a private federal right of action and lack of federal jurisdiction, respectively. We have jurisdiction under 28 U.S.C. § 1291 (1976). We affirm, but on a different basis.

---

1. The plaintiffs joined as defendants the former company (Burlington Northern, Inc.), the new holding company (Burlington Northern Holding Co.), the new railroad-oriented subsidiary (Burlington Northern Transportation Co.), and the United States. Apart from entering a notice of appearance, the United States did not actively litigate any of the issues in the action, and all briefs and motions were entered solely on behalf of the Burlington defendants. The district court nonetheless dismissed the action as to all defendants.

2. Plaintiffs argued in the district court that formation of the holding company violates the provisions of the Interstate Commerce Act, 49 U.S.C. §§ 10101–11917 (Supp. III 1979), and the regulatory scheme established under it by the Interstate Commerce Commission (ICC). However, they do not appeal the district court's ruling that, even if plaintiffs have a cause action based on those violations, exclusive primary jurisdiction over those matters rests with the ICC.

## I

In 1864, Congress passed a land grant act (the Act), which chartered the corporate predecessor of Burlington for the purpose of securing the construction and maintenance of a railroad and telegraph line between Lake Superior and Puget Sound. Northern Pacific Land Grant Act of 1864, ch. 217, § 20, 13 Stat. 365, 372. The Act states that the railroad "shall be a post route and a military road, subject to the use of United States, for postal, military, naval, and all other government service . . . ." *Id.* § 11. The final section of the Act reserves to Congress the power to "add to, alter, amend, or repeal" the Act, "to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times . . . the use and benefits of the same for postal, military, and other purposes . . . ." *Id.* § 20.

Pursuant to the Act, the United States granted the railroad both a right of way for the railroad and necessary land for related buildings and side-tracks. *Id.* §§ 2, 7. It also granted forty million acres of land to the railroad *in praesenti,* to be patented as sections of the railroad were completed, "for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway." *Id.* § 3. The railroad accepted the grants under section 3, subject to certain conditions respecting the building of the railroad line, which, if breached for over a year, could be remedied by the Congress "to insure a speedy completion of the said road." *Id.* § 9.

The Act forbids the railroad corporation from mortgaging its property "except by the consent of the Congress." *Id.* § 10. In 1870, however, Congress authorized the issuance of bonds secured by mortgage liens on the lands granted to Burlington under section 3 of the Act. J. Res. 67, 16 Stat. 378 (1870). One of the union plaintiffs, BRAC, holds bonds allegedly secured by Burlington lands.

In 1981, the board of Burlington authorized its management to proceed to form a holding company as a means of restructuring and making more efficient the now diverse operations of the company. On May 11, 1981, without seeking a preliminary injunction, plaintiffs filed the present action for declaratory and injunctive relief to prevent the reorganization. On May 14, a majority of the shareholders of Burlington approved the restructuring. The corporate reorganization was consummated soon thereafter, and the holding company created. On December 30, 1981, the trial court entered an order granting defendants' motion for summary judgment, from which appellants timely appealed.

## II

Plaintiffs contend first that Burlington's transfer to other corporate units in the reorganized Burlington entity of assets granted to Burlington pursuant to section 3 of the Act violates federal law. Plaintiffs' argument boils down to one central allegation based on federal law: that the provision of the Act require the corporation to hold the lands granted to it under section 3 of the Act (and the proceeds of those lands) in "trust," to ensure not only the initial construction of the railroad but also the permanent maintenance of a railroad and telegraph line along the northern route. They assert that these provisions are violated by a transfer of the assets derived from the section 3 grants to corporate entities with functions or purposes unrelated to the operation of a northern route rail and telegraph line.

The district court held that, even if the alleged transfer does violate the Act, none of the various plaintiffs in this action have a private cause of action to enjoin or rescind that violation. After considering the language of the Act, its legislative history, and the context in which it was enacted, we are not certain that Congress did not intend shareholders and creditors of Burlington to have a private right of action under the Act against the corporation to

rescind or enjoin acts of the corporation that are outside the terms of its charter.[3] Nonetheless, regardless of whether such a private federal right of action exists, we would affirm the district court's dismissal of the claim if no violation of the terms of the Act has been alleged.

■ We conclude that no violation of the Act has been stated here, since the terms of the Act set no limitations on the power of the corporation to dispose of the lands and proceeds of the lands granted under section 3 of the Act once the railroad has been completed. This conclusion is supported by the language of the Act itself, its legislative history, and the various cases construing the Act and other similar land grant legislation.

First, the language of the Act suggests that Burlington received the section 3 lands as a *quid pro quo* for *building*—but not for maintaining—the railroad. Section 3 of the Act states that the purpose of the grant is to aid "in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transporta-

---

**3.** The district court correctly observed that the violation of a federal statute and an injury to some person as the result of that violation do not by themselves give rise to a private cause of action in favor of the injured person. *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). In addition, the statute in question must expressly or impliedly give rise to a private cause of action for the injured party.

Where, as here, a statute does not expressly provide a private cause of action, the crucial question is whether the Congress of 1864 intended that a private right of action exist. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 378, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982). Congressional intent may be discerned by looking to the legislative history of the statute, including any evidence of intent to create or to deny a private remedy, and to other factors, including "the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional role of the States in providing relief." *Id.* at 377–78 n. 60, 102 S.Ct. at 1839 n. 60.

A brief look at the Act in light of these factors indicates that the district court may have been incorrect in refusing to find an implied private cause of action to remedy alleged violations by Burlington of the Act. The explicit language of the Act and its legislative history might, at first glance, suggest that Congress did not intend to establish any private right of action under the Act. *See* Act § 9 (establishing remedy of Congress to "insure a speedy completion of the said road"); *id.* § 20 (reserving power to Congress to amend Act to keep the railroad in working order and available for governmental use). Congress' explicit reservation of power in itself to supervise the construction and continuing operations of the railroad, together with the absence of any provision mentioning a private cause of action, would seem to negate a conclusion that the Congress of 1864 intended private parties to be able to sue to enforce the terms of the Act. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1978) ("where a statute expressly provides a particular remedy or remedies, a court should be chary of reading others into it"). However, the widespread acceptance of the proposition that shareholders and creditors of the corporation could challenge the validity of *ultra vires* corporate acts at the time Congress enacted the Act supports a conclusion that Congress assumed the existence of a private federal right of action to enforce the provisions of the Act.

The importance of the legal atmosphere at the time of the congressional enactment at issue in determining congressional intent is both conceded by defendants and repeatedly emphasized by Justice Stevens in *Merrill Lynch. See* 456 U.S. at 378–79, 102 S.Ct. at 1839 (if Congress enacts statute in area where private remedy already exists, "the question is whether Congress intended to preserve the preexisting remedy"); *see Cannon,* 441 U.S. at 696–99, 99 S.Ct. at 1957–1959 (majority opinion); *id.* at 718, 99 S.Ct. at 1968 (Rehnquist, J., concurring).

At the time of the enactment of the Act, shareholders and creditors of a corporate entity generally had a private right of action against the corporation, under the doctrine of *ultra vires,* to enforce the provisions of the corporation's governmentally granted charter. *See Central Transp. Co. v. Pullman's Palace Car Co.,* 139 U.S. 24, 40–53, 11 S.Ct. 478, 481–486, 35 L.Ed. 55 (1891) (collecting cases) (applying *ultra vires* doctrine to void contract of railroad corporation); *see generally* 7A W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 3399–3400, 3406, 3414, 3444, 3453 (rev. perm. ed. 1978). Because of the existence and use of the *ultra vires* doctrine in 1864, the 38th Congress had no reason to provide explicitly in the Act a private cause of action to enforce its terms. We suggest that this may be an appropriate case to find that Congress intended to preserve the private right of action of shareholders and creditors. We need not decide in this case, however, whether a federal right of action may lie against the corporation, for in any event, as we discuss in text *infra,* no violations of the charter have been alleged here.

tion of the mails, troops, munitions of war, and public stores, over the route of said line of railway." This language could of course be read as a condition on the grant requiring a permanent devotion of the granted lands to railroad-related purposes so as to ensure a permanent means of "safe and speedy transportation" of the mails and troops. We think that the section is read more naturally, however, simply to explain the reason for the grant—to assist the capitalization of a railroad company whose line would be available for use in moving the troops and the mails. We do not read the "purpose" language as a restriction on the use of the granted lands.[4]

Moreover, the conditions imposed in the Act on the grants of land under section 3 also relate solely to the construction of the railroad and not to its continuing maintenance. *See* Act § 4 (patents rendered when line "ready for the service contemplated"); *id.* § 9 (Congress may intervene, when company breaches Act's conditions, "to insure a speedy *completion* of the said road") (emphasis added).

The legislative history of the Act is replete with affirmations that the government was "giving away" one-twentieth of the public lands of the country to secure the building of a northern route rail line. *See generally* Cong.Globe, 38th Cong., 1st Sess. 1698–1702, 2291, 2292, 2295–97, 2611, 3290–91 (1864). These references convey the sense of Congress that section 3 was intended to grant lands to the company in fee

simple contingent only on the completion of the railroad.[5]

Finally, several of the cases discussing the Act refer to those grants of land that were *not* granted for right of way under section 2 as consideration solely for the *construction* of the railroad by the company. *See Great Northern Railway Co. v. United States,* 315 U.S. 262, 273–74 & 273 n. 6, 62 S.Ct. 529, 533–534 & 533 n. 6, 86 L.Ed. 836 (1942) (comparing "lavish grants from public domain" under the Act made "outright" to "subsidiz[e] railroad construction" to "limited fees" granted for "rights of way"); *United States v. Northern Pacific Railway Co.,* 256 U.S. 51, 63–64, 41 S.Ct. 439, 441–442, 65 L.Ed. 825 (1921); *St. Paul & Pacific Railroad Co. v. Northern Pacific Railroad Co.,* 139 U.S. 1, 6–7, 11 S.Ct. 389, 390–391, 35 L.Ed. 77 (1891); *H.A. & L.D. Holland Co. v. Northern Pacific Railway,* 214 F. 920, 923 (9th Cir.1914). These cases are consistent with those discussing the almost identical language of other land grant acts. *See Deseret Salt Co. v. Tarpey,* 142 U.S. 241, 252–53, 12 S.Ct. 158, 162–163, 35 L.Ed. 999 (1891) (Union Pacific Land Grant Act of 1862); *Burke v. Southern Pacific Railroad Co.,* 234 U.S. 669, 679–80, 34 S.Ct. 907, 911–912, 58 L.Ed. 1527 (1914) (Southern Pacific Land Grant Act of 1866).

For these reasons, we conclude that Congress granted the section 3 lands to Burlington's predecessor in fee simple subject only to the condition that the railroad be

---

**4.** This reading is borne out by the first proviso of § 3, which deducts from the grant of lands under the Act acreage equivalent to that already granted to others in conjunction with the "*construction*" of any stretch of the northern route railway. If the lands granted under § 3 were to be restricted in use to ensure not only the construction but also the continuing maintenance of a railroad along the northern route, Congress presumably would have required the subtraction of a previous grant from the grant made under the Act only if the previous grant itself had been for the purpose of both construction *and* maintenance.

**5.** The failure of Congress in 1864 to enact a provision making the land grants subject to an executory limitation that the railroad comply with all provisions of the Act is consistent with

this conclusion. One member of the House did express his belief that "the grant is not sufficiently guarded in case this company fails to comply with the conditions and provisions of this bill" and sought "to amend [the bill] in one or two particulars for the purpose of providing more thoroughly for such a contingency." Cong.Globe, 38th Cong., 1st Sess. 2293 (1864) (remarks of Rep. Sloan). The proposed amendment, which would have made the grants of land to Burlington subject to an executory limitation that Burlington not be in breach of the terms of the Act for a period of over six months, was agreed to at the time. *Id.* Nevertheless, the proposed amendment was inexplicably *not* present in the substitute bill later put forward and enacted into law. *Id.* at 2611–12 (Rep. Sloan voting "yea" on substitute bill).

constructed, a condition which has long since been satisfied. We are not free to engraft restrictions on the use of assets Congress transferred to Burlington's predecessor in addition to that single condition which Congress itself chose to impose.

Absent such further restrictions, plaintiffs' allegations of the transfer of assets to subsidiaries of the new holding company whose corporate purposes are not railroad-related establish no violation of federal law. *See* 28 U.S.C. § 1331 (1976). Consequently, we affirm the district court's order of dismissal of the plaintiffs' first claim on the ground that plaintiffs, by asserting the transfer solely of section 3 lands, have not alleged a violation of the Act.[6]

### III

BRAC, one of several union plaintiffs, further contends that Burlington's transfer of assets from a corporate entity devoted to railroad purposes violates or threatens to violate the terms of the bond indentures.[7] The district court ruled that the claim did not arise under federal law. After dismissing plaintiffs' other claims, it dismissed the claim for lack of pendent jurisdiction. The district court ruled correctly.

■ Since the plaintiffs made no allegations in the complaint respecting the citizenship of BRAC or the dollar value of the amount in controversy, the district court could not properly exercise diversity jurisdiction over the bond-related claim. Moreover, since the district court concluded that all other causes of action raised by plaintiffs that were allegedly based on federal law were either insubstantial or not within the district court's jurisdiction, the district court properly exercised its discretion to refuse pendent jurisdiction over claims of violation of the bond indenture based on state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). As the *Gibbs* court made quite clear, "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims *should be* dismissed as well." *Id.* (emphasis added) (footnote omitted).

Plaintiffs' contention that the bond-related claim raises a federal question because the use of the granted lands as security for the bonds required congressional authorization is frivolous. Justice Cardozo made clear years ago that a case arises under federal law in both the statutory sense (28 U.S.C. § 1331) and in the Article III sense *only if* the "right ... will be supported if the ... laws of the United States are given one construction or effect, and defeated if they receive another." *Gully v. First National Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). "That authority to enter into a contract finds its source in some federal law does not necessarily bring a cause of action based upon its breach under federal law." *Rosecrans v. William S. Lozier, Inc.,* 142 F.2d 118, 123 (8th Cir. 1944).

---

**6.** Plaintiffs nowhere assert that Burlington is transferring or selling any § 2 right-of-way lands, *i.e.,* those assets granted outright to the railroad in 1864 for direct use in the construction and operation of the rail line. Thus, we need not decide whether Burlington, consistently with its charter (the Act), could either transfer such right-of-way lands to an entity with purposes unrelated to transportation or use such lands for non-railroad purposes. *See Northern Pac. Ry. Co. v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 672, 47 L.Ed. 1044 (1903) ("the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company" but rather was granted in effect as "a limited fee, made on the implied condition of reverter in the event that the company ceased to use or retain the land" for the "legitimate purposes of the railroad"); *H.A. & L.D. Holland Co. v. Northern Pac. Ry. Co.,* 214 F. 920, 923 (9th Cir.1914) (lands granted under § 2 "are acquired upon the implied condition that they be used for railroad purposes, and the rights conferred are limited to such use").

**7.** To the extent that BRAC contends that it, as a bondholder of Burlington, has a cause of action to secure compliance of the corporation with the terms of the Act, regardless of the terms of the bonds, this claim requires a finding of a violation of the Act. As we have discussed *supra* in Section II, no such violation has been alleged here.

An alleged violation of the terms of the bond indentures could conceivably be within the court's federal jurisdiction if, for example, the terms of the indentures that were allegedly violated required compliance with the provisions of the Act. However, since plaintiffs do not argue that the question whether Burlington has breached the terms of the bond indentures somehow depends on the interpretation of the provisions of the Act or any other federal law, plaintiffs bond-related claim is not a federal question under the *Gully* test.

### IV

We affirm the judgment of the district court on the grounds that, even if a private cause of action may lie against the railroad for violations of the terms of the Act, no violations of the Act were alleged here and that the bond-related claim presents no federal question.

AFFIRMED.