## IOWA RAILROAD LAND COMPANY v. BLUMER.

### IN ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 207. Argued February 26, 27, 1907.—Decided May 27, 1907.

Under the act of Congress of May 15, 1856, 11 Stat. 9, and the act of the legislature of Iowa of July 14, 1856, the grant to the Dubuque & Pacific Railroad Co. was *in præsenti* and the title passed from the United States and vested in the State of Iowa when the map of definite location was lodged in the General Land Office, and the right of the company then attached. *Iowa Falls Land Co.* v. *Griffey*, 143 U. S. 32.

Where a grant is *in præsenti* and nothing remains to be done for the administration of the grant in the Land Office, and the conditions have been complied with and the grant fully earned, the company has such a title, notwithstanding the want of final certificate and the issue of the patent, as will enable it to maintain ejectment against one wrongfully on the lands, and prescription will run in favor of one in adverse possession under color of title. *Deseret Salt Co.* v. *Tarpey*, 142 U. S. 421; *Toltec Ranch Co.* v. *Cook*, 191 U. S. 532.

Although one who in good faith enters and occupies lands within the place limits of a railway grant *in præsenti* may not obtain any adverse title against the Government, if, as in this case, his possession is open, notorious, continuous and adverse, it may; if the railway company fails to assert its rights, ripen into full title as against the latter, notwithstanding the entry in the Land Office was cancelled without notice as having been improperly made and allowed.

THIS is a writ of error to the Supreme Court of the State of Iowa, seeking reversal of its judgment affirming the decree of the District Court of Woodbury County, quieting the land title of Claude F. Blumer, defendant in error, as against the Iowa Railroad Land Company, plaintiff in error. 129 Iowa, 32. The record discloses that Blumer brought his action by a petition in equity under the Iowa Code, claiming to be owner in fee simple of forty acres of land in Woodbury County, Iowa, being the N. E. ¼ of the N. E. ¼ of section 1, township 89 north, range 46 west, containing about forty acres; averring that the plaintiff and his immediate grantor had been in open, notorious, continuous and adverse possession for more than ten years under a claim of title and that the plaintiff was then in the possession of the same; and that defendant made some claim to the said estate, and prayed that he be quieted in his title and that defendant be estopped from setting up any claim adverse to his own.

Defendant answered and set up general denials and that the defendant was the owner of the premises by virtue of an act of Congress of May 15, 1856, making a grant of lands to the State of Iowa in alternate sections in aid of the construction of certain railways in that State, whereby the lands were granted to the State of Iowa in trust for the railway companies; that the act and trust were duly accepted by the State of Iowa, by act of its legislature, approved July 14, 1856; that thereafter, by the act of April 7, 1868, of the same state legislature, the Iowa Falls & Sioux City Railroad Company was designated to construct and complete the portion of the railroad west of Iowa Falls; and the State granted, on conditions contained in said act, the unearned portions of said lands west of Iowa Falls to the said Iowa Falls & Sioux City Railroad Company, and that all the terms of the act had been complied with and that the same were rightfully subject to the certification and conveyance to the said railway company, which was the grantor of the defendant.

A reply and amendment were filed, and also a supplemental

answer setting forth that the lands on the twenty-fourth of January, 1903, since the former answer in the case, had been duly certified to the State of Iowa in trust for the Iowa Falls and Sioux City Railroad Company, and had been subsequently patented to the railroad company by the Governor of the State on February 2, 1903, and that all the rights and title of the railway company had been succeeded to by the defendant, the Iowa Railroad Land Company, and prayed to be quieted in its title as against the plaintiff. By an amended reply the plaintiff reiterated that for more than ten years prior to the commencement of the suit, plaintiff and his immediate grantor had been in open, notorious, continuous and adverse possession of the premises under a claim of right and color of title, and that plaintiff was then in possession of the same.

The lands in question are within the place limits of the grant to the State of Iowa by the act of May 15, 1856. 11 Stat. 9. By the act of the legislature of Iowa, passed July 14, 1856, the lands were granted to the Dubuque & Pacific Railroad Company. The map of definite location of the line of the road was filed in the office of the Commissioner of the General Land Office of the United States on October 11, 1856, and accepted on October 13, 1856.

The legislature of Iowa, on April 7, 1868, passed a statute (Iowa Laws, 1868, chap. 124, pp. 164–167), designating the Iowa Falls & Sioux City Railroad Company (grantor of the plaintiff in error) to construct and complete the uncompleted portion of the road west of Iowa Falls. Sec. 1 of the act legalized and confirmed the contract between the Dubuque and Sioux City Railroad Company and the Iowa Falls & Sioux City Railroad Company "transferring so much of the Dubuque and Sioux City [successor of the Dubuque and Pacific] Railroad as remains to be constructed, together with the franchises, right of way, depot grounds, and other appurtenances of said road to be completed, also transferring all right and title of the said Dubuque and Sioux City Railroad Company to so much of the lands granted by Congress to aid

in the construction of said road as shall appertain to, or be legally applicable to the construction of the uncompleted part of the Dubuque and Sioux City Railroad, as aforesaid, except as to the lands hereinafter granted to the Dubuque, Bellevue and Sabula Railroad Company." Sec. 4 of that act provides: "That so much of land grant as is applicable to the uncompleted portion of the road aforesaid, west of Iowa Falls . . . is hereby conferred upon the said Iowa Falls & Sioux City Railroad Company, subject to the terms and conditions of the act of Congress granting the said lands, dated the 15th day of May, A. D. 1856, and the act amendatory thereto and the act of Congress passed the present session" (subject to certain conditions as to the time and manner of construction).

The railroad company complied with this act as to the completion of the road, having done so by January 1, 1872, also complying with the act of Congress of March 2, 1868, 15 Stat. 38, requiring the completion of the road by that date. The tract of land in controversy was again selected and designated by the Iowa Falls & Sioux City Railroad Company, on June 19, 1884, and on April 24, 1885, as lands to which the company was entitled under said land grants, and said last named selection was accepted by the register and receiver, and certified to the Commissioner of the General Land Office at Washington, May 13, 1885.

In December, 1858, the lands were listed for the benefit of the Dubuque & Pacific (since Iowa Falls & Sioux City) grant under the act of May 15, 1856, but afterwards, on February 21, 1859, the tract was included in a selection of the State of Iowa under the Swamp Land Grant. Under the order of the Secretary of the Interior the lands were stricken from the certified list with a view of determining the claim of the State under the Swamp Land Grant, which claim was finally rejected on February 16, 1878.

The lands were certified pending the suit, January 20, 1903, and on February 2, 1903, the lands were patented by the

Governor of Iowa to the Iowa Falls & Sioux City Railroad
Company.

On October 2, 1883, John Carraher (predecessor in title
of the defendant in error) made application to the local land
office at Des Moines, Iowa, to enter the lands under the Tim-
ber Culture Act, 20 Stat. 113. His application was rejected
and Carraher appealed. The rejection was because of conflict
with the railroad grant. On December 3, 1883, the Commis-
sioner affirmed this action. Carraher appealed to the Secre-
tary of the Interior. Afterwards, July 17, 1891, the Secretary
approved the decisions and rejected the claim of Carraher.
Pending his appeal, on May 31, 1888, Carraher made another
timber culture entry (No. 607). When the Secretary's decision
of June 17, 1891, finally rejecting the first application of Carra-
her was promulgated by the Commissioner (July 11, 1891),
it was also directed that the second timber culture entry (of
May 31, 1888), be cancelled on the ground that it had been
allowed without authority.

The delay in certifying the lands after the final decision
against Carraher is thus accounted for by Mr. Samuel S.
Burdett, at one time Commissioner of the General Land Office,
and attorney for the plaintiff in error from June, 1888:

"On July 15, 1891, my firm advised the Iowa Railroad Land
Company of the Commissioner's action of July 11, 1891, in
which the Carraher entry had been cancelled and received
in reply the letter thereto attached and marked 'Exhibit
B' from P. E. Hall, president, dated July 28, 1891, in which
he asked that we 'take such steps as will result in the tract
in question being certified to the State for our benefit.'

"Thereafter, by personal application by myself and other
members of my firm, effort was made to secure the due certifi-
cation of the land under the grant, resulting in a promise
from the proper officials of the General Land Office, given on
or about October 1, 1891, that the tract would be included
in a patent which was then about to be prepared. . . .

"The duty of certifying the tract rested with the proper

officials of the General Land Office, and was in fact a mere clerical duty. No rule required the filing of an application in writing for the certification of lands embraced in a pending selection, and the practice of my firm in such matters was to urge, by personal request, the proper officials of the General Land Office to take up such lists and prepare the necessary certificate for the action of the Commissioner and Secretary. This was what was done with respect to the tract in question here, and our requests in the matter resulted in the promise that the land would be included in a patent, such as set out in my firm's letter of that date, to P. E. Hall, president, Exhibit 'C.' In the multitude of business transacted by my firm in the years succeeding the action referred to, it is impossible for me [to] recollect the details of this particular matter, nor do I recollect the circumstances under which the promise referred to in said letter was given, but that it was made to me or to some member of my firm, as a result of urgent requests for proper action, is certain, or the said letter of my firm, of October 1, 1891, Exhibit 'C,' would not have been written. It was the practice of my firm, in all matters in our hands from time to time, to call them up by personal application, with a view to securing action. When the certification finally issued on January 22, 1903, it was in response to a personal and urgent request from my firm.

"I know of no delay whatever caused by either the Iowa Railroad Land Company or its predecessors in interest, or by any of its agents or attorneys, and certainly none by myself or my firm in securing the final issuance of title by the United States to the tract of land in question. The delay in certifying the said land, after the Secretary's action of July 17, 1891, was wholly due to the want of action by the General Land Office, the company and its agents having performed every duty in timely manner required by the rules of the Department.

"The first cause of delay in final certification of said tract under the aforesaid railroad grant of May 15, 1856, was the selection by the State of Iowa, under the Swamp Land Grant

of 1850, which was filed February 21, 1859, and embraced said tract, which selection was not finally disposed of by the Land Department until 1878.

"The next cause of delay was the appeal of John Carraher from the decision of the Commissioner of the General Land Office, dated December 3, 1883, to make entry of said tract under the provision of the timber culture law. Delay was next caused by the loss of Carraher's application papers in the General Land Office, which is mentioned in the letter of the Commissioner to Mr. Van Deventer, dated September 6, 1887, Doc. No. 1, of this deposition, and in that of the Commissioner to Geo. W. Wakefield, Esq., Doc. No. 4, of this deposition. The next cause of delay appears to have grown out of the contention made in behalf of Carraher in support of his appeal, that the railroad grant had been fully satisfied, and that this tract was not needed to fill up the quota of lands due under the grant. This made necessary the adjustment of the grant which took place on April 9, 1891, as already detailed.

"Thereafter the Secretary disposed of Carraher's appeal on June 17, 1891. The delay in certifying the land under grant which subsequently ensued, occurred in the General Land Office. As to the causes of this last delay, I have no certain knowledge, but I can state it as a fact, that between the date of the Secretary's final decision on the Carraher application, down to a very recent date, the railroad division of the General Land Office has been overburdened with work consequent upon the duty of adjusting all of the railroad land grants made by Congress in aid of railroads, which was cast upon the Land Department by the provisions of the act of March 3, 1887, 24 Stats. at Large, p. 556. For the most of the time during that period the force of clerks in that division was insufficient to promptly perform the necessary labor attendant upon such adjustments and the conveyance of lands under the grants. The delay in certifying the tract in question may have been due to these conditions."

.*Mr. Charles A. Clark* for plaintiff in error:

The claims of plaintiff in error, specially set up and pleaded, of title to the land under a grant and certification, the equivalent of a patent from the United States, has been denied by the court below. Also its like claim that title by prescription could not be acquired against it while certification, was refused under the railroad grant and while the title remained in the United States. These present Federal questions.

Carraher's claim under the timber culture entry was not a claim to title in fee which alone can furnish the basis for title by prescription. *Ricard* v. *Williams*, 7 Wheat. 59.

Nor can a prescriptive title arise with no claim of right. *Harvey* v. *Tyler*, 2 Wall. 328; *Society for Prop. of Gosp.* v. *Town of Paulet*, 4 Pet. 480.

A claim under a sheriff's deed void for want of jurisdiction will not support title by prescription. *Walker* v. *Turner*, 9 Wheat. 541.

There can be no color of title in an occupant of land who does not hold under an instrument or proceeding or law purporting to transfer the title or to give the right of possession.

Nor can good faith be affirmed of a party in holding adversely where he knows he has no title and that under the law he can acquire none. *Deffeback* v. *Hawke*, 115 U. S. 392, 407; *Sparks* v. *Pierce*, 115 U. S. 412; *Litchfield* v. *Sewell*, 97 Iowa, 251; *Hayes* v. *United States*, 175 U. S. 260.

Under the statute of limitations of Iowa relating to lands, title by prescription cannot be acquired in the absence of an honest, *bona fide*, good faith claim of title. *Litchfield* v. *Sewell*, 97 Iowa, 260; *Wright* v. *Keithler*, 7 Iowa, 92; *Smith* v. *Young*, 89 Iowa, 340; *Clark* v. *Sexton*, 122 Iowa, 313; *Snell* v. *Mecham*, 80 Iowa, 55.

No such good faith is shown on Carraher's part. The facts to which attention has been called, *supra*, conclusively show bad faith on his part.

Courts cannot interfere while title is withheld by Land Department, in administration of the grant. *Humbird* v.

*Avery,* 195 U. S. 498, and cases cited; *Oregon* v. *Hitchcock,* 202 U. S. 70.

The statute of limitations cannot run or title by prescription have its inception while the Land Department withholds the title in the administration of the grant. *Gibson* v. *Choteau,* 13 Wall. 92; *Redfield* v. *Parks,* 132 U. S. 246, and cases there cited; *Morrow* v. *Whitney,* 95 U. S. 557; *North Pac. Ry. Co.* v. *Traill Co.,* 115 U. S. 600; *Railway Co.* v. *Prescott,* 16 Wall. 603; *Railway Co.* v. *McShane,* 22 Wall. 444; *Churchill* v. *Sowards,* 78 Iowa, 473; *Durham* v. *Hoosman,* 88 Iowa, 36; *Dickerson* v. *Yetzer,* 53 Iowa, 681; *Grant* v̂. *Railway Co.,* 54 Iowa, 673; *United States* v. *Montana Mfg. Co.,* 196 U. S. 577.

Cancellation of timber culture entry cannot be collaterally assailed. *Brown* v. *Gurney,* 201 U. S. 193; *Steele* v. *Smelting Co.,* 106 U. S. 447; *Smelting Co.* v. *Kemp,* 104 U. S. 636.

*Mr. Constant R. Marks* and *Mr. Henry C. Gardiner,* for defendant in error, submitted:

The grant under which the defendant claimed title in this case was a grant *in præsenti,* under which title passed from the Government to the railroad company upon the filing of the map of definite location, as was done in this case on October 13, 1856. *C., R. I. & P. Ry. Co.* v. *Grinnell,* 51 Iowa, 476; *Sioux City &c. Co.* v. *Griffy,* 72 Iowa, 505; *S. C.,* 143 U. S. 32; *B. & M. R. R. Co.* v. *Lawson,* 58 Iowa, 145; *Iowa Falls & S. C. Ry. Co.* v. *Beck,* 67 Iowa, 421; *C., B. & Q. R. Co.* v. *Lewis,* 53 Iowa, 101; *Courtright* v. *Railway Co.,* 35 Iowa, 386.

One can hold in subservience to the Government, invoking the aid of its Land Department and then, when the railroad company obtains title, use that holding as an honest claim of right in sustaining adverse possession against the railroad company. *Cole* v. *Railroad Co.,* 76 Iowa, 185.

One can obtain color of title and enter into possession while the title is in the Government, and when the title passes to the railroad company hold adversely against the latter until the statute has run, under the same color of title and posses-

sion. *Railroad Co. v. Allfree,* 64 Iowa, 500; *Sater v. Meadows,* 68 Iowa, 507.

As a general rule of all courts of last resort, the Statute of Limitations will begin to run against one claiming title from the Government from the date of his compliance with the requirements of the Government in favor of one holding adverse possession of the real estate. *Dolen v. Black,* 67 N. W. Rep. (Neb.) 760; *Udell v. Peak,* 7 S. W. Rep. (Tex.) 786; *Patten v. Scott,* 12 Atl. Rep. (Pa.) 292; *Hayes v. Martin,* 45 California, 559.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

The original grant of May, 1856, was *in præsenti.* The title passed from the United States and vested in the State of Iowa on October 13, 1856, when the map of definite location was lodged in the General Land Office, and the right of the company then attached. *Iowa Falls Land Company v. Griffy,* 143 U. S. 32.

Under the decisions made by this court in *Desert Salt Company v. Tarpey,* 142 U. S. 241, and *Toltec Ranch Company v. Cook,* 191 U. S. 532, notwithstanding the patent had not been issued, the railway company, grantor of the plaintiff in error, having succeeded to the right and title of the original company and complied with all the terms and conditions of the grant, as required in the legislation of Congress and the acts of the Iowa legislature after the acceptance of the grant by the State, was in a position and clothed with the requisite title in order to transmit the same to another who might have recovered possession of the lands, and it could itself have brought an action in ejectment to oust one holding adverse possession thereof, and being clothed with these rights was in such position that the Statute of Limitations would run against it in favor of one who occupied the premises by adverse possession under color of title. This was distinctly decided in the *Toltec Ranch Company case,* wherein it was held that the Stat-

ute of Limitations would run against the railroad company, thus situated toward the lands, although the patent had not issued.

It is sought to withdraw this case from the application of the doctrine of *Salt Co.* v. *Tarpey,* and *Toltec Ranch Company* v. *Cook.* It is argued that § 4 of the act of May, 1856, provided that if the roads were not completed in ten years the unsold lands should revert to the United States; that on March 10, 1868, the State of Iowa resumed the grant of lands as made to the original grantees; that by act of June 2, 1864, Congress provided in section 8:

"That no lands hereby granted shall be certified to either of said companies until the Governor of the State of Iowa shall certify to the Secretary of the Interior that the said company has completed, ready for the rolling stock, within one year from the first day of July next, a section of not less than twenty miles from the present terminus of the completed portion of said railroad, and in each year thereafter an additional section of twenty miles; but the number of sections per mile originally authorized shall be certified to each company, upon proof, as aforesaid, of the completion of the additional sections of the road as aforesaid; and upon the failure of either company to complete either section as aforesaid, to be annually built, the portion of the land remaining uncertified shall become subject to the control and disposition of the legislature of the State of Iowa, to aid in the completion of such road."

And, it is argued, that the effect of this section was to hold the legal title until the railways were built and completed, as therein specified, and that the Iowa Falls and Sioux City Railroad Company never took the legal title to the lands in controversy until certified under section 8, of the act of 1864, which, it is alleged, was not until January 20, 1903, followed by the Governor's patent of February 2, 1903.

But when the grant is *in præsenti,* and nothing remains to be done for the administration of the grant in the Land Department, and the conditions of the grant have been complied

with and the grant fully earned, as in this case, notwithstanding the want of final certification and the issue of the patent, the railroad company had such title as would enable it to maintain ejectment against one wrongfully on the lands, and title by prescription would run against it in favor of one in adverse possession under color of title. *Salt Co.* v. *Tarpey,* and *Toltec Ranch Co.* v. *Cook, supra.*

Applying and giving weight to the decisions thus recently rendered in this court, we think the debatable proposition in the case concerns not the title of the railway company, or its right to have maintained an action to recover the premises, but involves the right of Carraher, and the defendant in error as his successor, to claim the title to the premises by adverse possession.

We think the record discloses that for more than ten years required by the Iowa statute to ripen such title, Carraher was in possession of the premises. He had planted a large number of trees; caused the lands to be cultivated; had raised crops; had rented the lands to others, and was understood to be claiming the ownership. The answer of plaintiff in error to this claim of title is that Carraher was not in possession of the premises claiming title in good faith.

The record shows that in 1883, by an entry under the Timber Culture Act, Carraher claimed this forty acre tract. As we have seen in the statement preceding this opinion, his application was rejected by the Register of the General Land Office, whose decision was affirmed by the Commissioner and ultimately by the Secretary of the Interior. Pending his appeal, Carraher made a second application for the lands to the Register of the Land Office, and a receiver's receipt was issued to him. This receiver's receipt was dated May 31, 1888, and is as follows:

"Receiver's Receipt No. 607.        Application No. 607.

"Receiver's Office, Des Moines, Iowa, May 31st, 1888.

"Received of John Carraher the sum of Nine Dollars——

cents, being the amount of fee and compensation of Register and Receiver for the entry of Northeast —— of N. E. quarter of Section one, in township 89 of range 46, under the first section of the act of Congress approved June 14th, 1878, entitled 'An act to amend an act entitled an act to encourage the growth of timber on the Western Prairies.'

"$9.00. M. V. McHENRY, *Receiver.*

"Endorsed: State of Iowa, Woodbury County, Filed for record this 9th day of Dec., 1891, at 2 o'clock P. M., and recorded in Book 40 Lands, page 162, C. A. DeMun, Recorder. P. Shontz, Deputy."

It was enclosed to Carraher in a letter, of which the following is a copy:

"Mr. John Carraher. Sioux City, Iowa, June 2, 1888.

"My Dear Sir: I have the pleasure of handing you herewith your timber culture entry Receiver's receipt No. 607 for N. E. ¼ of N. E. ¼, 1, 89, 46.

"Respectfully, GEO. W. WAKEFIELD.

"P. S. You can take possession and proceed to comply with the timber culture laws."

After this receiver's receipt and letter, Carraher went into possession in the manner we have already stated and held it until 1901, when, shortly before his death, he conveyed the premises to the defendant in error. The contention is that this possession could not have been in good faith with any expectation of obtaining title from the Government at the conclusion of the eight years required by law in which to earn it; that Carraher knew that his first application under the Timber Culture Act had been rejected, and afterwards that decision was affirmed on appeal in 1891, and that he could not have continued in the occupation of the premises in good faith under claim of title.

The record shows that when the Secretary of the Interior (July 11, 1891), affirmed the decision against Carraher's first

timber culture entry the Commissioner in advising the Register and Receiver at Des Moines by letter of July 13, 1891, of that decision, added: "It appears that on May 31, 1888, more than three years after the rejection of his application, and while his case was pending before the Secretary of the Interior on appeal, your office allowed Carraher to make timber culture entry 607 of the land. The action was without authority and the entry has this day been cancelled." It does not appear that Carraher was notified that this entry 607 had been cancelled, nor was he ever called upon to appear in reference to the same, and the letter of the Commissioner discloses that the Register of the Land Office at Des Moines should not have allowed the entry to be made and that it was summarily cancelled without notice or hearing. Carraher had been advised by the letter from his counsel, who had become a judge of a court in Iowa, that he might take possession and proceed to comply with the timber culture law. As far as the record shows, he heard nothing further from his entry, knew nothing of its summary cancellation, and no attempt was made to disturb his possession of the premises.

The Supreme Court of Iowa held that there was nothing in these facts to show that Carraher was not acting in good faith, and with the belief that he would acquire title under the last entry under the Timber Culture Act, and we are not prepared to disturb this holding.

After 1891, as we have seen, the railway company was in position to have ousted him from the premises and asserted its superior title and right. It did not attempt to do this, and so far as the record discloses made no objection to Carraher planting and cultivating the trees required by the act of Congress to perfect his title under the second application. His possession was certainly open, notorious, continuous and adverse, and unless he was acting in bad faith, was such as would ripen into full title as against the railway company, it failing to assert its rights within the period of the Statute of Limitations. While until the time had run required by the

Timber Culture Act, Carraher would have been in no position to claim title as against the Government, he was occupying a hostile attitude toward the railway company, and, while recognizing title in the United States, he expected to acquire title from it, had excluded all others from the use and occupation of the land and held under no other title. The Supreme Court of Iowa has held that under such circumstances the statute of limitations of Iowa would run in his favor as against the railroad company, and we find no reason to disturb that conclusion. And for more than ten years that company was in such position under its grant that it might have maintained an action in ejectment and asserted its title to the premises as against Carraher.

We find no error in the judgment of the Supreme Court of Iowa and it will be

*Affirmed.*

MR. JUSTICE BREWER concurs in the judgment.