(116 So. 168)

No. 28648.

### EVANS v. JACKSON.

Feb. 13, 1928.    Rehearing Denied March 12, 1928.

*(Syllabus by Editorial Staff.)*

**1. Appeal and error ⬥➾790(1)—Rejection of defendant's application for homestead entry of land sued for held not to require dismissing appeal, in view of claim by prescription.**

In petitory action to recover land, where defendant claimed to have applied to have land surveyed and to be allowed to make homestead entry, and claimed title by adverse possession, fact that, pending appeal, Department of the Interior had affirmed decision of Commissioner of the General Land Office rejecting defendant's application to make homestead entry, does not require dismissal of appeal, since defendant also claimed by prescription.

**2. Public lands ⬥➾7—Land titles are not affected by state legislation until they pass from United States.**

Titles to lands acquired from United States are not subject to or affected by state legislation until such titles have passed from United States.

**3. Adverse possession ⬥➾7(2)—Prescription; state statute of prescription does not aid occupant until title passes from United States.**

Occupancy of land acquired from United States is of no avail under state statute of prescription until title has passed from United States.

**4. Public lands ⬥➾71—Title to land granted held to pass from United States on railroad's location and construction (Act Cong. June 3, 1856 [11 Stat. 18]; Act No. 96 of 1857).**

Under Act Cong. June 3, 1856 (11 Stat. 18), granting land to the state of Louisiana to aid in constructing railroad, accepted and granted to railroad by act of Louisiana Legislature approved March 11, 1857 (Act No. 96 of 1857), title to all odd-numbered sections which had been surveyed in 1857 and 1858 appearing as odd-numbered sections on official plat of survey approved March 18, 1839, within distance of six sections from definite location of line of railroad, passed from United States as soon as railroad was definitely located and constructed.

165 LA.—24

**5. Public lands ⬥➾71—Title to lands not shown on original plat as granted held not to pass from United States making prescription apply thereto until and unless shown subject to grant on official plat of resurvey or extension survey (Act Cong. June 3, 1856 [11 Stat. 18]).**

Under Act Cong. June 3, 1856 (11 Stat. 18), granting public lands to state of Louisiana to aid in constructing railroad, title for lands not shown as lands on original plat approved March 19, 1839, did not pass from United States until and unless shown to be an odd-numbered section within distance of six sections from line of railroad on official plat of resurvey or extension survey approved August 17, 1925, making defense of prescriptive title by adverse possession inapplicable as against one claiming through grant to railroad.

**6. Adverse possession ⬥➾7(3)—Prescription; alleged fact that, if survey had been correct, land would have appeared within government grant making prescription applicable, may not be used as basis for prescription against claimant under grant (Act Cong. June 3, 1856 [11 Stat. 18]).**

In petitory action to gain possession of land, alleged fact that, if plat of survey approved by government had been completed, and if lake shore had been completely meandered, land in controversy would have appeared as part of odd-numbered section, which under Act Cong. June 3, 1856 (11 Stat. 18), was granted to state to aid in construction of railroad, so as to make prescription applicable after title passed from United States, cannot be set up, since government, which alone had right to make survey, did not show such location of land.

Appeal from First Judicial District Court, Parish of Caddo ; E. P. Mills, Judge.

Petitory action by W. C. Evans against Andrew Jackson. From a judgment for plaintiff, defendant appeals. Affirmed.

Clifton F. Davis, of Shreveport, for appellant.

Thigpen, Herold, Lee & Cousin, of Shreveport, for appellee.

O'NIELL, C. J. This is a petitory action, in which the plaintiff claims a tract of land described as lots 3 and 9 of fractional section 33, in Tp. 18 N., R. 15 W. The defendant has been in possession of lots 3, 9 and 10 of the

fractional section 33 for over 30 years, believing it to be public land and intending and endeavoring to perfect a homestead entry.

The plaintiff first claimed title through mesne conveyances from John Page, who held a patent from the United States for all of fractional section 33, Tp. 18 N., R. 15 W., dated the 1st of December, 1894. But, inasmuch as the land occupied by the defendant was not within the meander line shown on the official plat of survey approved March 19, 1839, but was shown as being in the bed of Cross Lake, the plaintiff abandoned his claim of title under the Page patent, because of our ruling in Land v. Brockett, 162 La. 519, 110 So. 740, and in Thigpen v. Noonan, 162 La. 527, 110 So. 743, and the plaintiff then bought the land from the Quapaw Land Company, after filing the suit, and asserted his new title in a supplemental petition. The Quapaw Land Company held title under and by virtue of the land grant made to the state of Louisiana by the Act of Congress approved June 3, 1856 (11 Stat. 18), to aid in the construction of a railroad from the Texas state line by way of Greenwood to the Mississippi river, of every alternate and odd-numbered section of land within the distance of six sections on each side of the railroad; which grant was accepted and the land conveyed by the state of Louisiana to the Vicksburg, Shreveport & Texas Railroad Company by an act of the Legislature approved March 11, 1857, being Act 96 of 1857, p. 76.

Answering the suit, the defendant averred that the land which he was occupying was public land belonging to the United States, that he had occupied and cultivated it for over 30 years, and that he had made application to have the land surveyed and to be allowed to perfect a homestead entry; and, in the alternative, he pleaded that, if the court should hold that the title for the land had passed from the United States by virtue of the Vicksburg, Shreveport & Texas Railroad land

grant, he had acquired title by adverse possession and the prescription of 30 years. He pleaded, primarily, however, first, that lots 3 and 9 of fractional section 33 were not included in the land grant made by the act of Congress of June 3, 1856, because the land was not included as a part of fractional section 33 on the plat of survey on file when the grant was made; second, that, if the land was conveyed by the Act of Congress of June 3, 1856, the grantee was guilty of laches in failing and neglecting to have the land surveyed and approved by the government, and by such laches had lost all right to claim the land by virtue of the grant; and, third, that the Land Department of the United States had refused to approve the selection and claim of the Quapaw Land Company under the grant to the Vicksburg, Shreveport & Texas Railroad Company.

There was judgment for the plaintiff, declaring him to be the owner of the land. The defendant has appealed from the decision.

[1] The plaintiff, appellee, has filed a motion to dismiss the appeal on the ground that the defendant has no further interest in the suit; and, in support of the motion, the appellee has attached to it a certified copy of a ruling of the Department of the Interior, of date the 14th of September, 1927, affirming a decision of the Commissioner of the General Land Office, rejecting the defendant's application to make homestead entry for lots 3, 9, and 10 of fractional section 33, Tp. 18 N., R. 15 W., because of the conflict with the selection list filed by the Quapaw Land Company as agent for the Vicksburg, Shreveport & Pacific Railroad Company, successor of the Vicksburg, Shreveport & Texas Railroad Company. The plaintiff, appellee, has filed also a supplemental motion to dismiss the appeal, and has attached to the motion a certified copy of a ruling by the Secretary of the Interior, dated the 4th of January, 1928—

only last month—denying the defendant's motion for a rehearing in the case.

In connection with the motion to dismiss the appeal, and in order to avoid the necessity for remanding the case, the attorneys representing the appellant and those for the appellee have filed a written agreement and stipulation, declaring that the documents attached to the original and supplemental motion to dismiss the appeal are true and correct copies of the decisions of the Department of the Interior, and may be considered by the court as if the case had been remanded and the documents filed in evidence and the record returned to this court.

We decline to dismiss the appeal because, while the ruling of the Commissioner of the General Land Office, affirmed by the Secretary of the Interior, shows that the decision of the district judge in this case was correct on the conflict of titles, the defendant is entitled to a hearing on his plea of prescription.

In affirming the decision of the Commissioner of the General Land Office, rejecting the application of Andrew Jackson to make homestead entry for the land in controversy, the Secretary of the Interior adopted the same reasons which he had given on the same day, September 14, 1927, for affirming a decision of the Commissioner rejecting the application of one Josephine Attaway to make homestead entry for lots 2 and 4 of section 25 in the same township; and in the latter case the Secretary of the Interior said:

"The application was rejected to the extent stated because of conflict with the selection list filed by the Quapaw Land Company as agent of the Vicksburg, Shreveport & Pacific Railroad Company. The application was not adjudicated as to lots 1 and 2, sec. 36, Tp. 18 N., R. 15 W., La. M.

"Mrs. Attaway alleges occupancy of the land for more than 25 years.

"The plat of survey of the subdivisions here involved was filed June 16, 1926. It was based upon a re-establishment of the lines defining the lands surveyed in 1837 and 1838 and an extension survey including lands not shown upon the plat of the original survey.

"The selection list was filed under the provisions of the Act of June 3, 1856 (11 Stat. 18), which provides:

" 'That there be and is hereby granted to the state of Louisiana, for the purpose of aiding in the construction of a railroad from the Texas line, in the state of Louisiana, west of the town· of Greenwood, via Greenwood, Shreveport, and Monroe, to a point on the Mississippi river, opposite Vicksburg; * * * every alternate section of land designated by odd numbers, for six sections in width on each side of said road. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the Governor of said state, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States, nearest to the tier of sections above specified, so much in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or otherwise appropriated, or to which the right of pre-emption has attached as aforesaid.' * * *

"The grant was conferred by the state upon the Vicksburg, Shreveport & Texas Railroad Company, the map of definite location of which was filed March 27, 1857. The road was constructed within the time fixed by the granting act—ten years. The present owner of the road is the Vicksburg, Shreveport & Pacific Railroad Company. By decision of December 13, 1926, the Department recognized the Quapaw Land Company as agent for the Vicksburg, Shreveport & Pacific Railroad Company in the filing of said selection list.

"Counsel contends that the tracts in controversy, which were indicated on the plat of the original survey as covered by the waters of Cross Lake, were excepted from the grant of 1856, and that the claim of the railroad company is barred by the state statute of limitations.

"The title of a railroad company to sections of land granted it by Congress in aid of its construction, but to be afterwards located when the line of its road shall be determined and the road constructed, attaches upon location and construction of the road, and will then relate back to the date of the statutory grant, so as to cut off all intervening claimants unless their rights are specifically reserved. Missouri, Kan-

sas & Texas Railway Co. v. Kansas Pacific Railway Co., 97 U. S. 491 [24 L. Ed: 1095].

"The only lands excepted or reserved from the grant of 1856 are those sold or otherwise appropriated or to which the right of pre-emption had attached at the time the line of the road was definitely fixed. As the land in controversy was unsurveyed at the time of filing of the map of definite location on March 27, 1857, it is clear that no pre-emption right could have attached prior to definite location, for, as stated by the Supreme Court of the United States in St. Paul, Minneapolis & Manitoba Railway Co. v. Donohue, 210 U. S. 21 [28 S. Ct. 600, 52 L. Ed. 941], there was no right of preemption on unsurveyed lands until the homestead act of June 2 [May 30], 1862 (12 Stat. 418 [409]).

"Until the land in controversy had been surveyed and the plat filed, the railroad company was not in position to maintain a claimed title in any specific tract, for the survey of the land is reserved to the government, and prior to such survey it cannot be determined whether any particular land will or will not be part of an odd-numbered section and therefore within the terms of the grant limited to the odd-numbered sections. United States v. Montana Lumber & Manufacturing Co., 196 U. S. 573 [25 S. Ct. 367, 49 L. Ed. 604]. Therefore no laches or limitation can be implied as against the grant until, by the public surveys, the land is identified as part of an odd-numbered section.

"No claim to the land in controversy existed on March 28, 1857, when the map of definite location of the railroad was filed. It was therefore not excepted from the grant of 1856, and is not public land of the United States subject to homestead entry.

"The decision appealed from is affirmed."

In denying Jackson's motion for rehearing, the Secretary of the Interior assigned as his reasons those which he had given on the same day, January 4, 1928, for denying a motion for rehearing in the case of Gaines Moore v. City of Shreveport and the Vicksburg, Shreveport & Pacific Railroad Company, viz.:

"Gaines Moore has filed motion for rehearing in the above-entitled case, wherein the Department, by decision dated September 14, 1927, affirmed the action of the Commissioner of the General Land Office, dismissing his protest against the allowance of the application of the city of Shreveport to purchase certain lands in Louisiana under the provisions of the Act of

June 4, 1924 (43 Stat. 382), described, in part, as lots 1, 2, 3, and 4, Sec. 21, Tp. 18 N., R. 15 W., La. M. Moore asserted a right through settlement thereon. The department held that the lots in question were not public lands of the United States, having been granted to the state by the Act of June 3, 1856 (11 Stat. 18), in aid of the construction of a railway.

"The decision in question gave a full and fair statement of the facts, and a review of the law bearing upon the case. It was shown that the grant was of every alternate section of land designated by odd numbers for six miles in width on each side of the road, with a provision for indemnity for losses within six miles of the line of the road, or of the grant in place, to be taken within 15 miles on each side of the road; that the grant was conferred by the state upon the Vicksburg, Shreveport & Texas Railroad Company; that the grant attached in the six-mile granted limits March 27, 1857, the date of filing by the company of the map showing the definite location of the road; that the present owner of the grant is the Vicksburg, Shreveport & Pacific Railroad Company, successor by purchase to the Vicksburg, Shreveport & Texas Railroad Company, under a decree of the Supreme Court of the United States (99 U. S. 513 [25 L. Ed. 460]); that the land in dispute was only recently surveyed, the plat of fractional Tp. 18 N., R. 15 W., based upon the reestablishment of the lines surveyed in 1837 and 1838, and an extension survey, including a number of islands in Cross Lake and certain areas about the margin of the lake omitted from the original survey, having been filed June 16, 1926; that the land is within the granted limits of the road as originally located and finally constructed; that under the settled rule of the Department and the courts the definite location of the line of road excludes the subsequent acquisition of settlement rights on unsurveyed lands subject to the grant; and that, though a survey is necessary to identify the grant, it has nothing to do with the vesting of title to the land falling within the grant as thus identified, citing Missouri, Kansas & Texas Railway Co. v. Kansas Pacific Railway Co., 97 U. S. 491 [24 L. Ed. 1095]; St. Paul & Pacific Railroad Co. v. Northern Pacific Railroad Co., 139 U. S. 1 [11 S. Ct. 389, 35 L. Ed. 77], and United States v. Montana Lumber & Manufacturing Co., 196 U. S. 573 [25 S. Ct. 367, 49 L. Ed. 604].

"It should be observed that the interest, actual or potential, held by the Vicksburg, Shreveport & Pacific Railroad Company in the lands under the Act of June 3, 1856, supra, had been transferred on August 1, 1903, by a special

master to the Railroad Lands Company, Limited, and that the liquidators of the land company, on April 12, 1926, transferred its interest and right in and to certain tracts in odd-numbered sections in Tp. 18 N., R. 15 W., including those here in dispute, to the Quapaw Land Company, Incorporated. The list embracing said lots was filed by the Quapaw Land Company June 2, 1926, and by decision of December 13, 1926 (A–9625), the Department recognized said company as agent for the Vicksburg, Shreveport & Pacific Railroad Company in the filing of said selection list.

"The motion filed on behalf of Gaines Moore has been elaborately argued both orally and by brief. It is contended, in substance (1) that at least a part of Pine Island, the land in dispute—that is, that part thereof shown on the plat of June 16, 1926, as lots 1 and 2, Sec. 21, being that part of Pine Island which occupies the portion of the N. ½ of S. W. ¼ Sec. 21—is not within the six-mile granted limits of the road. It is argued furthermore that the survey of 1837–38 was the controlling survey at the date of definite location of the road; that the grant was of certain technical sections, and under the rule announced by the Department in State of Florida et al. v. Watson, 17 L. D. 88, Pine Island forms no part of section 21 and did not pass under the grant to the state, or the railroad; (2) that the Quapaw Land Company never acquired the rights which the Vicksburg, Shreveport & Pacific Railroad Company had; (3) that the Vicksburg, Shreveport & Pacific Railroad Company has received all the land to which it was entitled under the Act of June 3, 1856, supra.

"In answer to the first contention it is sufficient to say that the approved plats and diagrams on file in the General Land Office, upon which the limits of the grant are marked, show the tracts in question fall within said limits. The approved plat is conclusive on the question. [McLean v. Union Pac. R. Co.] 22 Land Dec. 227; [Collett v. Northern Pac. R. Co.] 24 Land Dec. 180; [South & North Alabama R. Co.] 25 Land Dec. 468. It is clear, furthermore, that the principle of the decision in the case of State of Florida et al., supra, does not apply to the facts in the instant case. In the Florida Case an island in Orange Lake was surveyed as an independent tract without reference to section lines. In the instant case Pine Island was surveyed as an integral part of section 21, and the rights of the railroad company under its grant, and of all other parties, must be controlled thereby.

"In recognizing the Quapaw Land Company as the agent for the Vicksburg, Shreveport & Pa-

cific Railroad Company in the filing of said selection list, the Department did not assume to decide that said Quapaw Company was the successor in interest to the land grant rights of the railroad company, and no opinion was expressed as to the validity of the transfer evidenced by the deed executed April 12, 1926, by the liquidators of the Railroad Lands Company. If the deed submitted by the Quapaw Land Company purporting to convey this land is in all respects regular and serves the purpose for which it was executed, then title to lands carried by the patents, when issued to the state or to the grantee company, will, by operation of law, inure to the Quapaw Land Company. Certainly no interest of the United States will be put in jeopardy by the issuance of patents to lands granted, and lawfully earned. The line has long since been completed and in operation. The condition of the grant, therefore, has been fully performed, and the right to have the lands patented was perfect in the old company. That company has been on many occasions recognized by the Land Department as the successor to the land grant. Obviously, the government must perform all the duties and fulfill all the obligations imposed by the original act.

"The contention that the state of Louisiana, or the beneficiary under the grant, has already received more land than has been earned by the completion of the road, cannot be sustained. A tentative adjustment of the grant was made by the Commissioner of the General Land Office subsequent to the passage of the Act March 3, 1887 (24 Stat. 556 [43 USCA § 894 et seq.]), in compliance with departmental instructions of November 22, 1887 (6 Land Dec. 276). Said adjustment was submitted to the Department with the Commissioner's letter of February 26, 1890. At that time it appears the railroad had been completed. The bulk of the lands along the line of the road in North Louisiana had long been surveyed. The Commissioner reported the area of the odd-numbered sections within the six-mile or granted limits as 699,220.90 acres. The Commissioner submitted a tabulated statement showing the status of the grant as follows:

| | | |
|---|---|---|
| Area of grant............................. | | 699,220.90 |
| Lands certified within granted limits ................................ | 98,643.72 | |
| Vacant lands in granted limits subject to grant................. | 7,403.71 | |
| Disposed of after definite location | 333.10 | 106,380.53 |
| | | 592,840.37 |
| Selected and certified as indemnity........ | | 254,138.17 |
| Due as indemnity............................ | | 338,702.20 |

165 LOUISIANA REPORTS

"At the date of the Commissioner's report, 352.781.89 acres had been certified or patented under the grant, either as place or indemnity land. From time to time additional lands were certified or patented under the grant. A statement showing land grants made by Congress in aid of the construction of railroads, compiled from the records of the General Land Office and published with the approval of the Secretary of the Interior in 1907, revised and republished in 1915, shows that the grant to Louisiana under the Act of June 3, 1856, supra, was deficient by upward of 200,000 acres. In submitting that tabulation, the Commissioner stated that great care had been exercised in its preparation and that it was as accurate as it is possible to make it from the data available. This, therefore, is the latest official, estimate or measurement of the area of the granted lands, and, while not conclusive, it must be regarded as the best evidence in the matter, and controlling in the instant case.

"The motion is, therefore, denied and the decision of September 14, 1927, adhered to."

The ruling of the Secretary of the Interior, affirming the decision of the Commissioner of the General Land Office, was against the defendant in this suit on every plea or defense made in his answer hereto, except. of course, the plea of prescription of 30 years under the state statute.

[2-5] A sufficient reason why the plea of prescription cannot prevail is that the titles to lands acquired from the United States are not subject to or affected by state legislation until such titles have passed from the United States; and therefore the occupancy of such land is of no avail under a state statute of prescription until the title for the land has passed from the United States. Gibson v. Chouteau, 13 Wall. (80 U. S.) 92, 20 L. Ed. 534; McCune v. Essig, 199 U. S. 382, 26 S. Ct. 78, 50 L. Ed. 237; Iowa Railroad & Land Co. v. Blumer, 206 U. S. 491, 27 S. Ct. 769, 51 L. Ed. 1153; Buchser v. Buchser, 231 U. S. 157, 34 S. Ct. 46, 58 L. Ed. 166; Haggerty v. Annison, 133 La. 338, 62 So. 946; Riggio v. McNeely, 135 La. 391, 65 So. 552. The title for all of the odd-numbered sections which had been surveyed in 1837 and 1838, and which

appeared as odd-numbered sections on the official plat of that survey, approved March 19, 1839, within the distance of six sections from the definite location of the line of railroad, passed from the United States as soon as the railroad was definitely located and constructed; but the title for the lands that were not shown as lands on the original plat approved March 19, 1839, did not pass from the United States under the grant of June 3, 1856 (11 Stat. 18), until and unless shown to be in an odd-numbered section on the official plat of the resurvey or extension survey approved August 17, 1925. Deseret Salt Co. v. Tarpey, 142 U. S. 241, 12 S. Ct. 158, 35 L. Ed. 999; Toltee Ranch Co. v. Cook, 191 U. S. 532, 24 S. Ct. 166, 48 L. Ed. 291; Iowa Railroad & Land Co. v. Blumer, 206 U. S. 491, 27 S. Ct. 769, 51 L. Ed. 1153.

As the Secretary of the Interior said, in his opinion, supra:

"Until the land in controversy had been surveyed and the plat filed, the railroad company was not in position to maintain a claimed title in any specific tract, for the survey of the land is reserved to the government, and prior to such survey it cannot be determined whether any particular land will or will not be part of an odd-number section and therefore within the terms of the grant limited to the odd-numbered sections. United States v. Montana Lumber & Manufacturing Co., 196 U. S. 573 [25 S. Ct. 367, 49 L. Ed. 604]. Therefore no laches or limitation can be implied as against the grant until, by the public surveys, the land is identified as an odd-numbered section."

In the case cited by the Secretary of the Interior (United States v. Montana Lumber & Manufacturing Co., 196 U. S. 573, 25 S. Ct. 367, 49 L. Ed. 604), the court referred to a railroad land grant similar to the one involved in this case, thus:

"It has been decided many times that such grants are in præsenti, and take effect upon the sections of the land when the road is definitely located, by relation as to the date of the grant. But the survey of the land is reserved to the government; * * * in other words, the identification of the sections—whether odd

or even—is reserved to the government. * * * Until the identification of the even and odd-numbered sections, the United States retained a special property, at least, in the timber growing in the township; and this was sufficient to enable it to recover the value of the timber cut and removed by the defendants. A contrary conclusion would impair the government's right of survey, and force it into controversies over surveys made by the railroad or its grantees. * * * Indeed it would reverse the statutory grant of powers and transfer the location of the sections from the government to the railroad company."

[6] It is contended by counsel for the appellant that the land in controversy was not subject to the rule stated in the opinion which we have quoted, because it was an easy matter to observe that, if the plat of the survey made in 1837 and 1838, approved March 19, 1839, had been completed, and if the lake shore had been correctly meandered, the land in controversy would have appeared as a part of the odd-numbered section—33. The land in controversy is the northern part of the fractional E. ½ of E. ½ of the section, being bounded on the east by the section line, which extends to the lake, and on the north and west by the lake. It is nearly half a mile from the land that was shown as the fractional section 30 on the plat approved March 19, 1839, and is separated from it by an arm of the lake. In the resurvey and extension survey approved August 17, 1925, it was necessary to extend the southern boundary of fractional section 30 (as shown on the original survey approved March 19, 1839) nearly a quarter of a mile eastward, and to locate the southeast corner of the section, and thence to project the entire east line of the fractional section northward about three-quarters of a mile, to the lake shore, in order to show that the land in controversy was a part of fractional section 30. The government alone had authority to make such a survey. If the railroad company, or its grantee, had had such a survey made under any other authority than that of the United States government, it would have had no effect. The language of the Secretary of the Interior, in his decision in this case, and of the Supreme Court of the United States, in the decision quoted, is too plain and unqualified in that respect to admit of any exception with reference to the land in controversy in this case.

The judgment appealed from is affirmed.